HOMER AND WANDA EDGMON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edgmon v. Commissioner
Docket No. 29097-90
United States Tax Court
T.C. Memo 1993-486; 1993 Tax Ct. Memo LEXIS 494; 66 T.C.M. (CCH) 1093; October 20, 1993, Filed *494 Decision will be entered under Rule 155. For petitioners: Cyril L. Lawrence. For respondent: Guy Glaser. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent determined the following deficiencies in and additions to tax for the 1986, 1987, and 1988 tax years: Additions to Tax Sec.
Sec.
Sec.
Sec.
Sec.
Year
Defic- 6651(a)
6653(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
6661
iency
1986
$ 20,915
$ 5,229
-- $ 1,046
[1]
$ 5,229
1987
23,528
5,871
-- 1,176
[1]
5,882
1988
21,909
2,190
$ 1,102
-- --
5,477
*495 The issues presented for our decision are: (1) Whether petitioners are liable for deficiencies in their Federal income taxes attributable to an understatement of gross receipts from the operation of their bar and restaurant during the taxable years 1986, 1987, and 1988; (2) if so, whether petitioners are liable for self-employment taxes on income attributable to an increase in gross receipts for the taxable years 1986, 1987, and 1988; (3) whether petitioners are liable for additions to tax pursuant to section 6651(a) for failure to file their 1986, 1987, and 1988 Federal income tax returns timely; (4) whether petitioners are liable for additions to tax for negligence or disregard of rules or regulations pursuant to section 6653(a)(1)(A) and (B) for 1986 and 1987 and pursuant to section 6653(a)(1) for 1988; and (5) whether petitioners are liable for substantial understatement additions to tax pursuant to section 6661 for the 1986, 1987, and 1988 taxable years. Some of the facts have been stipulated and are so found. Petitioners Homer Edgmon and Wanda Edgmon, husband and wife, resided in Stevinson, California, when they filed the petition in this case. FINDINGS OF FACT Petitioners' *496 tax returns for the years in issue were filed on the following dates: Tax Year
Date Return Filed
1986
May 8, 1989
1987
June 14, 1989
1988
June 15, 1989
Petitioners and respondent did not agree to any extensions of the filing period for the returns in issue in this case. During the years in issue, petitioners owned and operated a bar and restaurant called the Stevinson Bar and Grill (SB&G). Petitioners initially acquired the SB&G in 1978. Before purchasing the SB&G, Mr. Edgmon changed car and truck tires in and around San Jose for various employers. Mrs. Edgmon generally was not employed outside the home, but she worked as a bartender in San Jose for several years before petitioners purchased the SB&G. In 1983, petitioners sold the business for a total price of $ 250,000. The terms of the sale were $ 50,000 down and the remainder payable over time pursuant to a promissory note secured by the business property. In January of 1985, petitioners foreclosed against the purchasers and regained possession of the business. The SB&G is located in Stevinson, California, a rural/agricultural town, about a 1-1/2-hour drive from San Jose. During the years in issue, petitioners *497 lived in the same building that housed the bar and grill and used the grill's cooking facilities to make their personal meals. The SB&G was open 365 days a year from 7 a.m. to 12 p.m. The clientele of the SB&G included farm workers, retired people, employees from a nearby winery, and visitors traveling through Stevinson. Customers paid in cash or check. The SB&G did not accept credit cards. The SB&G offered its customers breakfast, lunch, dinner, and beverages from the bar, including sodas, beer, and wine. In 1988 the SB&G began to serve distilled liquor. In addition, the SB&G had game machines, a pool table, a shuffleboard table, and a cigarette machine. Mrs. Edgmon was primarily responsible for purchasing the food and beverage inventory sold by the SB&G. Petitioners and their daughter, Deborah Holt (Holt) would place all inventory purchase receipts for the SB&G into a leather pouch (bookkeeper's bag). Sometimes inventory purchases were paid with cash from the register, safe, or endorsement of a customer's check. Petitioners did not keep track of the cash or customer check payments made for inventory purchases. Mr. Edgmon was primarily responsible for keeping track of *498 the SB&G's sales revenues. Mr. Edgmon utilized monthly sales register forms provided by his bookkeeper, Ms. Janet Silveira (Silveira), to record the SB&G's sales revenues. These forms consisted of ruled notebook paper, each line representing a day of the month. For 1986 and 1987, the form was divided into three revenue columns: Sales, game machines, and pool table. In 1988, a fourth column was added to the form for shuffleboard revenues. These forms were the only records kept by petitioners during the years in issue to report the SB&G's sales revenues. Petitioners never kept any of the sale orders, internal register tapes, or daily "Z" tapes. A "Z" tape is a tape produced by a cash register which reflects the amount of all sales transactions entered into the machine. After closing out the cash register and posting entries onto the monthly sales register form, petitioners would remove all the cash except for the amount to be used as the beginning cash for the next day, and place the remainder into their safe. At the end of each month, petitioners placed the monthly sales register forms into the bookkeeper's bag. Petitioners occasionally took money from the cash register to *499 give to Holt and their grandchildren. There is no evidence in the record indicating that these amounts were accounted for on the sales register forms. In addition, all members of petitioners' family were allowed to operate the cash register. During the years in issue, Silveira performed bookkeeping services for the SB&G. Silveira was not a certified public accountant and was not hired to perform bank reconciliations or an audit of the books and records of the SB&G. Based on the documents contained in the bookkeeper's bag, Silveira prepared monthly profit and loss statements and California State, local, and district sales and use tax returns for the SB&G. Silveira calculated the SB&G's total sales revenues for the month by relying on the monthly sales register forms and game machine receipts furnished to her by petitioners. Silveira never was provided with the cash-register "Z" tapes, the internal cash register tapes, or the sales slips that were provided to customers. During the years in issue, Silveira offered to provide petitioners with the necessary information to complete their Federal tax returns. Petitioners knew of their obligation to file Federal tax returns. Ultimately, *500 Silveira prepared petitioners' Federal tax returns for the years in issue. Commencing on May 10, 1989, the SB&G was audited by senior tax auditor Thomas Zacher (Zacher) of the California State Board of Equalization (CSBE). Zacher has done approximately 50 or 60 percentage markup audits of restaurants, liquor stores, and bars, in and around the Stevinson area, and has audited many establishments similar to the SB&G. The only books petitioners furnished to Zacher for the SB&G were the sales register forms, the monthly profit and loss statements, and Schedules C from petitioners' 1986, 1987, and 1988 Federal income tax returns. Initially, Zacher performed "achieved markup" percentage tests on the SB&G for the last 9 months of 1986, all of 1987, all of 1988, and the first quarter of 1989, to determine the SB&G's overall claimed markups and to aid him in deciding whether a full-scale audit was required. Zacher computed the "achieved markup" percentage for each of the audit periods by subtracting total cost of goods sold from the taxable sales reported to establish gross profit, and then dividing gross profit by the cost of goods. Based on Zacher's prior experience, he considered *501 that the results of the "achieved markup" percentage tests were low, so he decided to do a complete audit of the SB&G. Zacher performed a percentage markup audit covering the periods from April 1986 through March 1989. To determine the SB&G's actual audited "achieved markup" percentages, Zacher performed several percentage markup tests, based on the categories of costs of goods sold. To perform the actual audited percentage markup tests, Zacher requested that Mr. Edgmon provide the sales price and cost of several items offered for sale. Zacher performed markup percentage tests for soda, cigarettes, food, and beer and distilled spirits. For each category of goods sold, the results of Zacher's percentage markup tests revealed that the SB&G was achieving much higher markup percentages than had been reflected in the "achieved markup" percentage test he had previously performed. Zacher's cigarette markup test disclosed that the SB&G was achieving a total markup percentage on cigarette sales of 12.27 percent, or 1.1227 times cost. Zacher then applied this percentage to the SB&G's total reported cost of cigarettes to arrive at the following total audited cigarette sales: 1986
1987
1988
1989
Total (9 months)
(3 months)
$ 7,732 $ 7,536 $ 10,785
$ 145 $ 26,198
*502 Zacher did not make any allowance for waste or spoilage in this calculation since there is no spoilage when cigarettes are sold from a vending machine. Zacher performed the markup percentage test for canned sodas by dividing the sales price of a can of soda sold at the SB&G by the cost of the soda. Based on this analysis, the SB&G was achieving a total markup percentage of 127.98 percent, or 2.2798 times cost on canned soda sales. To determine total taxable soda sales for purposes of the audit, Zacher applied this percentage to the total cost of soda, by individual period, to conclude that the SB&G had the following audited soda sales: 1986
1987
1988
1989
Total (9 months)
(3 months)
$ 9,678 $ 16,282
$ 19,691
$ 3,837 $ 49,488
In computing these figures, Zacher allowed $ 50 a month for self-consumption and a standard 2-percent shrinkage rate. Petitioners never provided Zacher with any documents substantiating that the amount for self-consumption should be increased. To determine the audited percentage markup on food sales, Zacher obtained cost information about a typical item on the SB&G's menu from Mr. Edgmon. The cost to the SB&G of a typical *503 breakfast, such as ham and eggs, was approximately $ 1.19, and this meal sold for $ 3. Therefore, the markup percentage on the ham and eggs breakfast was 152.10 percent or 2.521 times cost. During the audit, Zacher learned from discussions with Mr. Edgmon that the SB&G generally "keystoned" its food sales. "Keystoning" is a term generally used to indicate that items are sold at double their initial cost. Based on discussions with Mr. Edgmon in which he stated that he "keystoned" the SB&G's food items, Zacher used an achieved markup percentage of 100 percent, or two times cost, to compute the SB&G's taxable food sales for purposes of the audit. Zacher applied this markup to the SB&G's cost of goods sold for food purchases, and arrived at the following audited total taxable food sales: 1986
1987
1988
1989
Total
(9 months)
(3 months)
$ 16,738
$ 38,904
$ 50,356
$ 12,870
$ 118,868
In calculating these figures, Zacher permitted allowances for groceries purchased for use or resale for family and friends, food giveaways at Christmas and Thanksgiving, and a 7-1/2-percent allowance for spoilage. These allowances were not substantiated by any books or records, *504 but Zacher was, in his terms, trying to be generous in his calculations. In total, Zacher deducted approximately $ 30,201 in allowances over the 36-month audit period, before applying the "keystone" markup rate. The amount deducted before markup was nearly one-third of all of the SB&G's cost of goods sold for food during that same period. Zacher also performed a markup percentage test on beer and distilled spirits. Since the purchases of wine by the SB&G were negligible, sales of wine were disregarded in the overall percentage markup analysis performed for beer and distilled spirits. Zacher determined the markup percentage for beer sold by the SB&G during the periods under audit, by dividing the sales price of the beer sold, exclusive of any sales tax, by its cost, which was obtained by examining the SB&G's beer purchase receipts for the month of March 1989. This test revealed that the SB&G was achieving a markup percentage on beer, exclusive of tax, of 182.50 percent, or 2.825 times cost. This markup was reasonable for beer sold in the Stevinson area. Zacher also computed an audited markup percentage for the sale of distilled spirits by the SB&G for the 1988 and 1989 audit *505 periods. The SB&G did not sell distilled spirits or mixed drinks in 1986 or 1987. In computing this markup, Zacher followed strict State policy guidelines. In doing this calculation, Zacher established the cost of each brand of liquor from purchase invoices made available to him by petitioners, obtained the price charged per drink from Mr. Edgmon, and referred to the audit manual to determine the number of 1-1/4-ounce shots that could be poured from the bottle. Zacher multiplied the number of shots per bottle (less a built in 8-percent spillage allowance) by the number of bottles purchased and the sales price per drink, deleted the tax, and then divided that total by the total cost of the bottles of distilled spirits audited. According to this calculation, the audited markup percentage by the SB&G on the sale of distilled spirits, exclusive of tax, for the audit periods under examination, was approximately 365.37 percent or 4.6537 times cost. This was a reasonable markup for distilled spirits sold in the Stevinson area. In calculating petitioners' audited taxable sales for beer for the 1986 and 1987 audit periods, Zacher applied the audited markup percentage for beer to petitioners' *506 total cost of goods sold for beer. For the 1988 and 1989 tax years, Zacher computed a "bar weighted markup" which was a weighted average of the beer and distilled alcohol markups. The "bar weighted markup" arrived at was 212.98 percent or 3.1298 times cost. Zacher applied these markups to their respective audit periods and arrived at the following audited taxable bar sales: 1986
1987 1988 1989
Total
(9 months)
(3 months)
$ 94,358
$ 114,828
$ 132,785
$ 27,383
$ 369,354
These figures took into account allowances for complimentary drinks and self-consumption based on petitioners' oral representations and a 1-percent shrinkage allowance, which is a standard rate used by the CSBE in its audits. According to Zacher's audit, over the periods from April 1986 through March 1989, the SB&G had total audited taxable sales of $ 563,908. The total amount of understated audited taxable sales for this period as reflected on Zacher's audit was $ 204,807. Zacher arrived at this amount by subtracting the total amount of taxable sales reported to the CSBE, which was $ 359,101, from the total amount of audited taxable sales computed during the percentage markup audits *507 performed, which was $ 563,908. The total taxable understatement for the periods under audit by the CSBE was $ 207,436. This figure includes the audited understatement in taxable sales ($ 204,807) plus inventory withdrawn for personal use in the amount of $ 2,650. The CSBE issued petitioners an audit report dated November 17, 1989, reflecting that the SB&G had underreported taxable sales of $ 204,786, and a total underreported taxable measure of $ 207,436, for the periods audited (apparently including slight transcription or arithmetic errors). Petitioners appealed this determination by the CSBE. Walter Franzell (Franzell), a senior tax auditor at the CSBE, was placed in charge of the appeal. As a result of this appeal, Franzell issued a reaudit report on December 17, 1990, reducing the SB&G's taxable sales measure by an additional $ 20,497. This reduction represented additional allowances granted by Franzell for self-consumed food and for food given away, based on oral representations of petitioners and various letters written by patrons of the SB&G. Petitioners never furnished Franzell with any documentary financial or accounting evidence to support their appeal for additional *508 allowances. In the statutory notices of deficiency issued to petitioners, respondent determined increases to petitioners' Schedule C gross receipts in the amounts of $51,858, $ 69,145, and $69,145, for the 1986, 1987, and 1988 tax years, respectively. These determinations were based upon the CSBE's audit performed by Zacher. In computing the adjustments, respondent took the audited taxable understatement of sales reflected on Zacher's original audit report, added back the inventory withdrawals for personal use, and divided that sum by the number of months in the audit period to determine an average monthly understatement of total taxable sales. Respondent then multiplied the average monthly understatement of taxable sales by 9 months for 1986 and 12 months each for 1987 and 1988 to arrive at the adjustments in the notice of deficiency. On brief, respondent has suggested that the determinations in the notices of deficiency properly might be decreased to reflect the results of Franzell's reaudit of the SB&G. In May 1992, a bank deposits analysis was performed by Revenue Agent Sandra Tucker. Bank deposits exceeded gross income reported on petitioners' tax returns in the following *509 amounts: 1986
$ 27,079
1987
37,798
1988
8,961
Petitioners never made a cash deposit into their sole business bank account. OPINION 1. Gross Receipts of the SB&G
Respondent reconstructed petitioners' gross receipts from petitioners' bar and grill for 1986, 1987, and 1988 and primarily relied on the audit prepared by the CSBE, which employed the percentage markup method. Under this method, gross sales are determined by adding a predetermined percentage to cost of goods sold. Bernstein v. Commissioner, 267 F.2d 879, 880 (5th Cir. 1959), affg. T.C. Memo. 1956-260. At trial, we denied petitioners' motion to shift the burden of proof. On brief, petitioners renew their argument that respondent's notices of deficiency are not entitled to a presumption of correctness because the determinations set forth therein are arbitrary and erroneous. Generally, a taxpayer has the burden of proving that the Commissioner's determination in the notice of deficiency is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). We normally do not look behind the notice of deficiency *510 to examine the basis for the Commissioner's determination or the propriety of the Commissioner's motives or administrative policies or procedures in making the determinations reflected in the notice. Jackson v. Commissioner, 73 T.C. 394, 400 (1979); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). On occasion, this Court has applied a limited exception to this general rule in cases involving unreported illegal income where the Commissioner fails to introduce any substantive evidence but rests on the presumption of correctness afforded the notice, and the taxpayer challenges the notice of deficiency on the grounds that it was arbitrary and excessive within the rule of Helvering v. Taylor, 293 U.S. 507 (1935). Courts differ on whether the burden of going forward with the evidence shifts to the Commissioner when the determination loses its presumption of correctness. The instant case is appealable to the Court of Appeals for the Ninth Circuit, and we will apply the standard enunciated by that court. See Golsen v. Commissioner, 54 T.C. 742 (1970), *511 affd. 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Ninth Circuit has held that in order for the presumption of correctness to attach to the statutory notice in unreported income cases, the Commissioner must come forward with substantive evidence establishing "some evidentiary foundation" linking the taxpayer to the income-producing activity, Weimerskirch v. Commissioner, 596 F.2d 358, 361, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or "demonstrating that the taxpayer received unreported income", Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982), affg. an order of this Court; see also Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985), affg. an order of this Court. This standard is applied even if the taxpayer has not made a showing that the notice is arbitrary. Weimerskirch v. Commissioner, supra at 361. If the Commissioner's unreported income determination is not supported by the proper foundation, the determination is "clearly arbitrary and erroneous." Id. at 362. *512 Once the Commissioner has carried the initial burden of introducing "some evidence linking the taxpayer with income-producing activity, the burden shifts to the taxpayer to rebut the presumption by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous." Rapp v. Commissioner, supra at 395. Respondent has provided the necessary evidence linking petitioners to the activity which produced the unreported income. Therefore, the statutory notices carry the presumption of correctness in this case. Furthermore, on the basis of the record here, it is clear that respondent's determinations are not arbitrary or erroneous and that they are "reasonable in light of all surrounding facts and circumstances", and we so find. Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). We sustain respondent's determinations based on the CSBE audit, as supported by the additional evidence presented at trial, with modifications in the computation. Section 6001 requires that all taxpayers maintain adequate records to determine their correct tax liabilities. Absent adequate records, or if the records that are kept *513 do not accurately reflect income, the Commissioner may determine the existence and amount of a taxpayer's income by using any method that clearly reflects income. Sec. 446(b); United States v. Johnson, 319 U.S. 503 (1943); Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989). It is proper for respondent to employ an indirect method to calculate income where the method used is reasonable. Holland v. United States, 348 U.S. 121 (1954); Davis v. Commissioner, 239 F.2d 187, 189 (7th Cir. 1956), affg. T.C. Memo. 1955-87; Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970). "The reconstruction need only be reasonable in light of all surrounding facts and circumstances." Petzoldt v. Commissioner, supra at 687; Giddio v. Commissioner, supra.The percentage markup method is well recognized as an appropriate means of reconstructing income where a taxpayer's records are incomplete or inaccurate. Bollella v. Commissioner, 374 F.2d 96 (6th Cir. 1967), *514 affg. T.C. Memo. 1965-162; Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956), affg. T.C. Memo. 1955-31; Stone v. Commissioner, 22 T.C. 893, 905-906 (1954); Cebollero v. Commissioner, T.C. Memo. 1990-618, affd. 967 F.2d 986 (4th Cir. 1992). Petitioners testified that sales were rung up on the cash register, and that the daily totals were entered on the monthly sales register forms. However, petitioners did not keep any of the underlying income documents to support the amounts that were handwritten on the monthly sales register forms. Petitioners failed to keep copies of any of the internal cash register tapes generated by their cash register when a sale was rung, failed to keep any of the cash register "Z" tapes that were generated each morning, and failed to keep any of the bills or sales slips presented by the SB&G to its customers for food and bar purchases. In the absence of such source documentation to verify amounts recorded in sale ledgers, we find that petitioners' records are not adequate. Aiken v. Commissioner, T.C. Memo. 1971-3. *515 Consequently, respondent is entitled to utilize any method which will clearly reflect income, as long as the method is reasonable and substantially correct. Harbin v. Commissioner, 40 T.C. 373 (1963). Alternatively, petitioners argue that if this Court finds that their records are inadequate, their bank deposits constitute the best evidence of taxable income. Under the circumstances of this case, the bank deposits analysis does not represent the most reliable record of petitioners' gross income. Petitioners' business was a cash business, and the bank deposits analysis reflects only amounts that were actually deposited in the bank. We doubt that the bank deposits in this case reflect petitioners' total business income since no cash deposits ever were made even though the SB&G was a cash business. In view of the nature of petitioners' business and because the great bulk of petitioners' receipts was in cash, in our view the business bank account deposits would represent a reasonable approximation of petitioners' gross income only if the cash had been deposited into the business bank account. Since no cash was deposited in the bank account, we conclude *516 that petitioners' gross income was in excess of the amount indicated by the bank deposits method by an amount sufficient to render that method unreliable in this case. The percentage markup method utilized by the CSBE auditor is substantially similar to the method used by the Commissioner in other cases involving a reconstruction of a taxpayer's income when the taxpayer's records were found incomplete or inaccurate. E.g., Cebollero v. Commissioner, supra; Wright v. Commissioner, T.C. Memo. 1967-86; Jurkiewicz v. Commissioner, T.C. Memo. 1955-318. The percentage markup method utilized by the CSBE and relied upon by respondent in the statutory notices of deficiency was a reasonable method to be relied upon to reconstruct petitioners' income. Nevertheless, we note that some modification of respondent's application of the markup data in this case is appropriate. The amounts of gross receipts reported on the Schedules C of petitioners' Federal income tax return are different than the amounts of gross sales petitioners reported to California. Therefore, the proper calculation to determine *517 petitioners' understatement in gross receipts is the difference between the CSBE audited taxable sales and the amounts reported as gross receipts on Schedule C by petitioners for each of the years in issue. Furthermore, the CSBE audited taxable sales figure did not include amounts received from the gaming machines. In our calculations we adjust the audited taxable sales figure to account for these differences. According to the initial CSBE audit prepared by Zacher, the SB&G had the following audited taxable sales for the years in issue: 1986 1987 1988 Cigarettes
$   7,732
$   7,536
$   10,785
Soda
9,678
16,282
19,961
Food
16,738
38,904
50,356
Beer/spirits
94,358
114,828
132,785
Audited sales
128,506
177,550
213,887
Since the original audit figures were reduced by $ 20,497 for the total period under audit by the California authorities, this allowance must be prorated to reduce the figures stated above. The audit period was 36 months, so the allowance is $ 569.36 per month. The period audited by the California auditors includes 9 months in 1986 and all of 1987 and 1988, so the total audited sales are reduced by $ 5,124 for 1986 and by $ 6,832 *518 for 1987 and 1988. Accordingly, the understatements in gross receipts for the years at issue are: 1986
1987
1988
Total audited sales
$ 123,382
$ 170,718
$ 207,055
Gaming sales
2,424
2,174
Total audited/gaming
123,382
173,142
209,229
Reported gross receipts
112,778
134,242
149,184
Understatement of
gross receipts
10,604
38,900
60,045
Petitioners are liable for the increases in their Federal income tax attributable to the above understatement in gross receipts. 2. Self-Employment Taxes
Respondent determined in the notices of deficiency that petitioners were liable for self-employment taxes on the unreported income from the operations of the bar and grill business. Respondent's determinations are presumed correct, and petitioners have the burden to prove otherwise. Rule 142(a). Section 1401 imposes a tax on the "self-employment income" of every individual. "Self-employment income" is defined generally in Section 1402(b) as "the net earnings from self-employment derived by an individual * * * during any taxable year". Section 1402(a) defines the term "net earnings from self-employment" as the "gross income derived by an individual from *519 any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". Section 1.1402(a)-2(b), Income Tax Regs., provides that the "trade or business must be carried on by the individual, either personally or through agents or employees." These provisions are to be broadly construed to favor treatment of income as earnings from self-employment. Hornaday v. Commissioner, 81 T.C. 830, 834 (1983). In the instant case, petitioners personally carried on the trade or business of a bar and grill. Accordingly, the net earnings from the bar and grill, to the extent of maximum earnings subject to Social Security, are self-employment income subject to tax pursuant to section 1401. 3. Additions to Tax for Late Filing
Respondent determined that petitioners are liable for additions to tax for failure to file a timely return for all of the years in issue. Petitioners have the burden of showing that their failure to file timely returns was due to reasonable cause and not to willful neglect. Sec. 6651(a). Section 6651(a) imposes an addition to tax for failure to file a required *520 return on or before the prescribed filing date (determined by including any extensions). Petitioners' return for each of the years in issue was filed late without an extension from respondent. Petitioners have offered no reason for the late filing of their 1986 and 1987 returns, and the record reflects that petitioners were aware of their obligation to file timely Federal tax returns. However, in 1989, Mrs. Edgmon suffered a severe illness during the early months of 1989, and we accept such illness as a reasonable cause for petitioners' failure to file that return timely. Accordingly, respondent's determinations under section 6651(a) are sustained for the 1986 and 1987 tax years. Petitioners are not liable for the addition to tax under section 6651(a) for the 1988 tax year. 4. Additions to Tax for Negligence
Respondent determined that petitioners are liable for additions to tax for negligence or disregard of rules or regulations for all of the years in issue. For the 1986 and 1987 tax years, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment when any portion of the underpayment is due to negligence or disregard of rules or regulations. *521 Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the deficiency attributable to negligence or disregard of rules or regulations. For the 1988 tax year, section 6653(a)(1) imposes an addition to tax equal to the sum of 5 percent of the underpayment when any part of the underpayment is due to negligence or disregard of rules or regulations and an amount equal to 50 percent of the interest payable on the portion of the deficiency attributable to negligence or disregard of rules or regulations. Negligence is defined as the lack of due care, or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination that petitioners' underpayments of tax are attributable to negligence or disregard of rules or regulations is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Petitioners have not presented *522 any objective facts or argument that they were not negligent in preparing their returns for the years in issue. Furthermore, the record demonstrates that petitioners failed to keep proper records for their bar and grill business. Petitioners did not keep any internal cash register tapes or sales slips used in their business. On this record, we sustain respondent's determination that petitioners are liable for the additions to tax under section 6653(a)(1)(A) and (B) for 1986 and 1987 and under section 6653(a)(1) for 1988. 5. Additions to Tax for Substantial Understatement
Respondent determined that petitioners are liable for additions to tax under section 6661 for a substantial understatement of income tax liability for the 1986, 1987, and 1988 tax years. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). An understatement, for purposes of this addition to tax, is the amount by which the amount required to *523 be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2); Tweeddale v. Commissioner, 92 T.C. 501 (1989). Petitioners have not established that substantial authority existed for the omissions of gross receipts, and they did not provide a statement or explanation of the omissions when they filed their income tax returns. Sec. 6661(b)(2)(B)(i) and (ii). Accordingly, respondent is sustained on this issue for each of the years in issue. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest payable on the portion of the deficiency attributable to negligence or disregard of rules or regulations.↩