# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-SA-01837-COA

**JACKSON LAND FOOD MART INC., ABDO FADEL, SULTAN NAJI AND SEENA NAJI**                    APPELLANTS

**v.**

**HERB FRIERSON, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF REVENUE OF THE MISSISSIPPI DEPARTMENT OF REVENUE**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/15/2019 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | JAMES GARY McGEE JR. |
| ATTORNEY FOR APPELLEE: | MORTON WARD SMITH |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 03/23/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    A convenience store and its owners were audited by the Department of Revenue and found to owe thousands of dollars for taxes they had never paid.  The taxpayers argued that the audit was unreliable but admitted they did not have records for their sales and sales tax markups.

¶2.    Finding that the taxpayers failed to rebut the presumption that the findings of the audit were correct, we affirm.

## FACTS

¶3.     The underlying facts giving rise to this appeal are not in dispute. Jackson Land Food Mart Inc. is a company in Picayune, Mississippi. It is owned equally by Abdo Fadel and Sultan Naji, both of Pearl River County. The company operates a convenience store and gas station off Jackson Landing Road in Picayune. The company filed taxes, as did Fadel, and Naji with his wife Seena.

¶4.     In 2017 the Department of Revenue (DOR) signaled it would audit Jackson Land Food Mart regarding taxes on prepaid wireless cards, corporate income tax, and sales tax. The audits spanned from 2013 to 2016 for the prepaid wireless cards, 2013 to 2015 for corporate income tax, and 2013 to 2016 for sales tax. The DOR informed Fadel and the Najis that their individual income tax returns would also be audited based on income they had received from Jackson Land Food Mart. These periods spanned from 2013 to 2016.

¶5.     Stores generally purchase items at a certain cost and then mark up the price for sale so they can make a profit. The difference between the cost and the final sale price reveals the profit on the sold item. The amount of "markup" can vary from item to item. When it came time for the various audits, the taxpayers admitted they did not have "any documents showing the markup percentage of specific items sold in the store during the audit period." Nor did they have any records showing the average markup on items sold in the store. The taxpayers also admitted they did not have any "z-tapes, register tapes[,] or point of sales receipts for sales made during the audit period."[1]

---

[1] As the United States Tax Court has explained, the "'Z' tape is a tape produced by a cash register which reflects the amount of all sales transactions entered into the machine." *Edgmon v. Comm'r of Internal Revenue*, 66 T.C.M. (CCH) 1093 (T.C. 1993).

¶6.     Despite the lack of z-tapes or other detailed records, Jackson Land Food Mart and its owners argued that they kept a handwritten ledger reflecting their sales. However, they admittedly did not have records of daily sales. In fact, the company conceded its cash registers did not even generate sales reports. The taxpayers also admitted that—while they on average sold items for a profit—their own records showed they actually sold items for a negative markup, losing money on certain sales. The only records they had of daily sales were the handwritten ledgers. The owners also clarified some of their inventory might not have been sold, but stolen—or in the lingo of the industry, subject to "shrinkage." However, they admitted that they did not have any actual records showing if items were stolen or lost.

¶7.     Jessie Armstrong from the DOR was assigned the task of auditing Jackson Land Food Mart. The auditor immediately ran into issues, because while the company "provided purchase invoices, . . . [it] did not have any point of sales records from registers." From what information there was, the auditor determined that "if the inventory purchased for sale were actually sold totaling the gross sales reported . . . then inventory must have been marked down, or sold at a loss, otherwise known as a negative markup."

¶8.     The auditor did have the benefit of the company's "federal and state tax returns, purchase invoices, a general ledger, a daily sales notebook," bank statements, and other tax information provided to third parties. The DOR had the cooperation of the taxpayers and actually performed the work at the office of the certified public accountants who worked for the business.

¶9.     To determine how the store paid taxes on sales, the auditor "performed a 10-day

3

purchase cycle analysis, in which [the auditor] recorded the purchase price of items from the invoices, then examined the retail price of items on the shelf in the Jackson Land Food Mart store." "By comparing the purchase cost against the retail sales price," the auditor "could calculate the average markup to see whether the markup was negative (as reported by [the taxpayers]) or a positive number."

¶10. Over the 10-day period, the auditor determined the store was not running at a loss. To the contrary, "[t]he average markup for items sold in the [store] was 44%, which contradicted the sales totals on [the] sales tax returns." This was the average markup on items, not the highest or lowest, and when it "was applied to the inventory purchases over the course of the audit" it "yield[ed] an increase[] in estimated annual sales."

¶11. After a visit to the store, the auditor noted that "[m]any items were not labeled for price and had to be priced by the register." The business also did not have a petty cash fund and would sometimes pay vendors or employees straight out of the cash in the register. There were other issues. Notably, "[t]he method of reporting sales tax used by [the CPA] was found to be unreliable and had a few mathematical errors." These errors led to additional taxes regarding beer sales. Likewise, as to the individual returns of Fadel and the Najis, "[t]he method of reporting income tax used by [the CPA] was found to be unreliable."

¶12. As a result of the increase in estimated annual sales, the auditor found that Jackson Land Food Mart had underestimated their "franchise tax and individual income tax liability, since the income projected flows to increased income for the business and owners." Including penalties and interest, the DOR determined the business owed $8,559 in taxes on

4

prepaid wireless cards, $4,699 for corporate income tax, and most notably, $145,722 for sales tax.[2] Fadel was informed he owed a further $31,866 for his individual income taxes, and the Najis likewise owed $31,866.

## COURSE OF PROCEEDINGS

¶13.    Jackson Land Food Mart as a company and Fadel and the Najis individually appealed the respective assessment of taxes—first to the Board of Review, and then to the Board of Tax Appeals. The former affirmed the assessments. The Board of Tax Appeals set a hearing date for the appeals, but "[t]he Taxpayer[s'] representative was unable to attend . . . and requested that he be allowed to rest upon the Taxpayer[s'] written submissions[.]"

¶14.    The argument presented by the various taxpayers before the Board was the same they now present to this Court—that the Department's audit findings should be discounted and deference given to the records from the company. However, there was compelling evidence that the store's records were simply unreliable. Critically, there were no contemporaneous records of substance detailing the store's actual sales. The Department's analysis showed the company claimed it was suffering losses of 13%, 21%, and 52% over the three years of the audit, respectively. The Department argued this was not plausible, as the business would have simply run itself into the ground if it had lost that much money every year.

¶15.    Ultimately, in upholding the sales tax assessments the Board ruled that it "was not provided with *any* evidence to rebut the Department's assessments." (Emphasis in original). Lacking any actual rebuttal from the taxpayers, the Board presumed the audit figures were

---

[2] After an initial objection, the company later withdrew its protest over the assessment of tax on the prepaid wireless cards.

correct.

¶16. The Board also explained how it had been thwarted even as it attempted to give the taxpayers the benefit of the doubt. "Although we understand that the Taxpayer *believes* that its records were adequate and that the records were provided to the Department . . . the Taxpayer did not substantiate *any* of its claims with source documentation nor did the Taxpayer or the Taxpayer's representative appear at the hearing to allow this Board to inquire further about the Taxpayer's assertions." (Emphasis in original).

¶17. The Board also affirmed the individual assessments regarding Fadel and the Najis. Just as it had concluded with the company, "the Taxpayer did not substantiate *any* of its claims in the corresponding sales tax appeal with *any* source documentation *or other rebuttal evidence*, and because neither the Taxpayer nor the Taxpayer's representative appeared at the hearing to allow this Board to inquire further about the Taxpayer's assertions," the Board of Tax Appeals held it was "unable to grant any relief to the Taxpayer." (Emphasis in original).

¶18. Jackson Land Food Mart and the various taxpayers then appealed to chancery court. Their argument was similar to the one before the Board of Tax Appeals—that they did have records and that they had a CPA who prepared their financial statements, but the Department allegedly ignored this information. The taxpayers argued that "[t]he auditor's determination that [their] records were 'inadequate' is arbitrary and capricious," and they disputed the method used by the auditor to ascertain the markup on items sold in the store.

¶19. In response, the DOR leaned on the failure to provide any rebuttal proof at all—arguing the "Petitioners cannot challenge the accuracy of the Department's numbers,

6

when they have admitted they don't know what their own numbers should be."

¶20. After a hearing, the chancery court found that the "Petitioners have not set forth any evidence through testimony, affidavit[,] or otherwise that rebuts the Court's assumption that the Department's assessment is *prima facie* correct." The chancery court emphasized the lack of proof presented by the taxpayers, who "do not have daily sales records from registers, nor . . . records showing the markup of specific inventory items," and "did not know the purchase price or sales price of items in their store during the audit period, and did not provide an amount for their gross sales each month." Nor did the taxpayers show any flaw in the auditor's method of estimating markup.

¶21. Absent any proof at all from the taxpayers, they "fail[ed] to present a genuine issue of material fact before the Court." "The fact that the Petitioners question the efficacy of the auditor is not enough to withstand the motion," the chancery court ruled, and therefore granted summary judgment in favor of the Department.

¶22. In the end, Jackson Land Food Mart, Fadel, and the Najis all appealed, and the matter was assigned to the Court of Appeals for review.

## STANDARD OF REVIEW

¶23. We review the grant of summary judgment de novo. *Bennett v. Hill-Boren P.C.*, 52 So. 3d 364, 368 (¶12) (Miss. 2011). "When reviewing the evidence on summary judgment, the Court should view the evidence in the light most favorable to the nonmovant." *Id.*

## DISCUSSION

¶24. This appeal is about the sales tax paid by a business. In Mississippi, sales tax is a

7

privilege tax—one that grants the payor "the privilege of engaging or continuing in business or doing business within this state[.]" Miss. Code Ann. § 27-65-13 (Rev. 2017). "[T]he dominant purpose of the privilege tax law is the collection of revenue[.]" *City of Bay St. Louis v. Milner*, 140 Miss. 592, 105 So. 480, 481 (1925). This revenue is then distributed as seen fit by the Legislature, which "holds the State's purse strings." *Pickering v. Langston Law Firm P.A.*, 88 So. 3d 1269, 1282 (¶59) (Miss. 2012).

¶25. A crucial part of the sales tax system is that taxpayers are required to keep records. "It *shall* be the duty of every person taxable under this chapter to keep and preserve for a period of three (3) years adequate records of the gross income, gross receipts or gross proceeds of sales of the business, including all invoices of merchandise purchased, all bank statements and cancelled checks, and all other books or accounts as may be necessary to determine the amount of tax for which he is liable." Miss. Code Ann. § 27-65-43 (Rev. 2017) (emphasis added). The "records shall be adequate in substance" to meet the requirements of the law, and "[a]ll records shall be open for examination, at any time, by the commissioner [of revenue] or his duly authorized agent." *Id*.

¶26. The law also allows the State to check whether taxpayers are providing the correct amount of tax. "Taxpayers' records may be sampled for audit purposes at the discretion of the commissioner and any assessment rendered as a result of same *shall* be considered prima facie correct." *Id*. (emphasis added).

¶27. Recently we analyzed the requirements of record keeping in another case about disputed sales taxes. "Taxpayers are required to keep adequate records of gross income and

8

sales." *U. Roofing & Constr. of MS Inc. v. Dep't of Revenue*, No. 2019-CA-00570-COA, 2020 WL 7221730, at *7 (¶25) (Miss. Ct. App. Dec. 8, 2020) (motion for reh'g pending). "When they do not, a presumption that the Commission's assessments are prima facie correct arises." *Id*.

¶28.    The auditor is not required to use "the best information available" to make an assessment; "in order for the assessments to be prima facie correct, the auditor must make them from *any* information available." *Id*. (emphasis added) (quotation marks omitted). Once the auditor's assessment is made and the presumption of prima facie correctness attaches, "the taxpayer bears the burden of proof showing that a genuine dispute exists regarding the correctness of the assessment." *Id*.

¶29.    So it is well established that the auditor's "assessment of taxes invokes a statutory presumption of correctness." *Id*.  The question in this case, as in other tax cases, is what data it takes to rebut that burden.  The presumption of correctness has been compared "with Mississippi Rule of Evidence 301 on presumptions in civil cases." *Id*.  In civil cases, "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption." MRE 301.  The "burden of persuasion . . . remains on the party who had it originally."  MRE 301; *see U. Roofing*, 2020 WL 7221730, at *7 (¶25); *see also Marx v. Bounds*, 528 So. 2d 822, 825 (Miss. 1988) (establishing the taxpayer's burden under the statute "comports" with Mississippi Rule of Evidence 301).

¶30.    The *Marx* decision remains key to unlocking disputes over the taxpayer's burden of proof.  Like this case, it involved the calculation of sales tax owed by convenience stores.

9

*Id.* at 823. There was also a field audit performed because of a concern the businesses were underreporting sales and therefore not paying sufficient sales tax. *Id.*

¶31. The auditor "found that [the owner] determined the amount of sales taxes due by utilizing bank statements of each business." *Id.* Just as here, the convenience stores did not keep detailed records. Instead, "the only records kept by [the owner] were purchase invoices and bank records." *Id.* at 824. "There were no records reflecting actual sales . . . , no sales invoices, no record of cash withdrawals, and no record of actual markups on the store's inventories." *Id.* The owner protested "that he had kept records showing gross receipts, but that by reason of their inadequacy, he had not produced them for the Commission." *Id.*

¶32. Ultimately, the owner of the convenience stores claimed he "computed total sales by adding total monthly deposits, *estimated* cash payouts to employees and vendors, and *estimated* owner cash withdrawals." *Id.* at 823 (emphases added). Because this was unreliable, the auditor calculated from "any information available" the quantity of items sold by the store and the markup from cost. *Id.*

¶33. In *Marx*, there was the "absence of any records reflecting actual cash payouts, actual cash withdrawals[,] or daily sales[.]" *Id.* at 824. So "the auditor took [the owner's] purchase invoices and applied a markup using as a basis the markups at the store at the time of the audit." *Id.* at 824-25. The owner had "admitted that he was not sure exactly how much his markups were" on the items he sold. *Id.* at 825. At one store, "he testified that he had no markups at all . . . but was selling goods at cost or below" cost, since he was trying to attract new customers. *Id.*

¶34.   Once the auditor dug into the business, he "concluded [the owner] had underreported gross sales from all his businesses" and in turn made a "deficiency assessment" that the businesses owed taxes. *Id*. at 823. The owner appealed, claiming he should not have had to pay the allegedly deficient taxes. *Id*. at 825-26.

¶35.   The Supreme Court focused heavily on the taxpayer's lack of records. *Id*. at 825. "The lack of adequate records alone gives rise to the presumption that the Commissioner's assessments are prima facie correct." *Id*. "The record undisputedly supports the fact that adequate records of gross sales were not maintained by [the owner]." *Id*. "Sales invoices were not maintained, and cash payouts were only estimated," and so "any calculation of gross sales was necessarily an estimate only." *Id*.

¶36.   In further exploring the burden a taxpayer faces after a deficiency assessment, the Court concluded a taxpayer must do something more than merely disputing the auditor's conclusions. *Id*. at 826. "A taxpayer's uncorroborated testimony that he sold goods at or below costs, coupled with a failure to maintain adequate records reflecting true sales, does not overcome the Commission's prima facie correct assessment and, without other proof, does not suffice." *Id*. at 827. For "the plaintiff may not prevail by merely saying his own return was correct or by merely submitting the applicable forms." *Id*. at 826. These general allegations or denials are not enough to shift the burden. *Id*. at 827.

¶37.   Nor did it shift the burden simply because the taxpayer had his accountant testify "because the accountant based his testimony on [the owner's] representations and recollections of his markups during the audit period." *Id*. This account was simply not

reliable. *Id.* In the end, the Court "conclude[d] that the taxpayer's proof was so inconsistent or improbable as to be unworthy of belief, and that the taxpayer did not overcome by competent evidence the State Tax Commission's prima facie case." *Id.* at 828.

¶38. The case at hand is significantly similar to *Marx*. Like the taxpayer there, Jackson Land Food Mart failed in nearly every possible way to abide by the statutory duty to "keep and preserve . . . adequate records of the gross income, gross receipts or gross proceeds of sales of the business, including all invoices of merchandise purchased, all bank statements and cancelled checks, and all other books or accounts as may be necessary to determine the amount of tax for which he is liable." Miss. Code Ann. § 27-65-43.

¶39. The taxpayers admitted they did not have point of sales receipts for what was sold at Jackson Land Food Mart; that they did not have any documents showing an average markup on items in the store; no documents showing the markup on specific items in the store; no records of daily sales; and no records of whether items were stolen or lost. The auditor reported that the store would sometimes even pay vendors or employees straight out of the cash in the register.

¶40. In fact, the taxpayers further admitted that their own records showed they would have been losing massive amounts of money at the store for three years running, but the DOR found this to be implausible. The taxpayer in *Marx* had a plausible reason one store was selling items at a negative markup—because he was trying to attract business to a new store. *Marx*, 528 So. 2d at 825. The company here made no such argument and was not in the same factual situation.

¶41. This failure to keep and maintain records according to state law dooms any attempt the taxpayers make at combating summary judgment. Both *Marx* and the statute are clear that an audit by the DOR is presumptively correct, and it is then the duty of the taxpayer to rebut it.

¶42. The fact that the taxpayers used a CPA to handle some of their financial affairs also does not shield them from the consequences of the audit's finding. The same issue was addressed in *Marx* but did not provide relief because the CPA was relying on faulty information from the taxpayer. Here the auditor concluded the CPA was miscalculating taxes on beer and likewise miscalculating the individual income tax owed by Fadel and the Najis. In any event, the CPA was still only relying on the data provided by the taxpayers, which, as set out above, did not contain the most basic information about the Jackson Land Food Mart sales.

¶43. There are different ways to keep financial records, and there could be situations where a taxpayer complies with the statute without digital spreadsheets or register Z-tapes. Even then, precedent and statute create a presumption that the findings of the auditor are prima facie correct. The only response by the taxpayers here was to insist they had enough to move forward. But as we have held before, "bare allegations cannot defeat a motion for summary judgment." *Jacox v. Circus Circus Miss. Inc.*, 908 So. 2d 181, 184 (¶6) (Miss. Ct. App. 2005). "The ritualized combat of the courtroom demands that favorable outcomes may be obtained only after meeting clearly established legal and procedural standards." *Id*.

¶44. Given that there were not adequate records to rebut the findings of the auditor, and

in many instances no records at all, the chancery court was correct to grant summary judgment in favor of the Department of Revenue.

## CONCLUSION

¶45.    State law requires maintaining "adequate records" that detail "gross income, gross receipts or gross proceeds of sales of the business, including all invoices of merchandise purchased, all bank statements and cancelled checks[.]" Miss. Code Ann. § 27-65-43.  The taxpayers here did not have adequate records, and indeed in many instances had no records whatsoever of these required types.

¶46.    In order to administer its services, the State must have revenue; in order to gain revenue, it requires payment of tax for the privilege of operating a business.  We presume the calculations by the auditor to be correct unless rebutted, and as the taxpayers did not keep adequate records, they could not rebut the findings.  As a result, they must pay the taxes, penalties, and interest assessed to them.  Accordingly, we affirm the chancery court ruling.

¶47.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE AND SMITH, JJ., CONCUR.  McDONALD AND EMFINGER, JJ., NOT PARTICIPATING.**

14