YESTERDAYS OF LAKE CHARLES, INC.

VERSUS

CALCASIEU PARISH SALES AND USE TAX DEPARTMENT

CONSOLIDATED WITH

14-414

COWBOY'S NIGHTLIFE, INC.

VERSUS

CALCASIEU PARISH SALES AND USE TAX DEPARTMENT

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2010-5555 C/W 2010-5554
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, John Saunders, Marc T. Amy, Billy H. Ezell and John E. Conery, Judges.

**AFFIRMED.**

**Amy, J. dissents and assigns reasons. Conery, J. dissents and assigns reasons.**

**David R. Kelly**
**David R. Cassidy**
**Nicole F. Gould**
**BREAZEALE, SACHSE & WILSON, L.L.P.**
**Post Office Box 3197**
**Baton Rouge, Louisiana 70821-3197**
**(225) 387-4000**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
   **Yesterdays of Lake Charles, Inc./Cowboy's Nightlife, Inc.**

**Robert R. Rainer**
**Attorney at Law**
**8480 Bluebonnet Boulevard, Suite D**
**Baton Rouge, Louisiana 70810**
**(225) 766-0222**
**COUNSEL FOR DEFENDANT/APPELLANT:**
   **Calcasieu Parish Sales and Use Tax Department**

**Scott J. Scofield**
**Andrea Albright Crawford**
**Scofield, Gerard, Pohorelsky, Gallaugher**
**Post Office Drawer 3028**
**Lake Charles, Louisiana 70602**
**(337) 433-9436**
**COUNSEL FOR DEFENDANT/APPELLANT:**
   **Calcasieu Parish Sales and Use Tax Department**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Yesterdays of Lake Charles, Inc. (Yesterdays) and Cowboy's Nightlife, Inc. (Cowboys) were subjected to an allegedly "random" audit on November 3, 2009, by the Calcasieu Parish School System Sales and Use Tax Department (Collector) for a four-year audit including the period from January 1, 2005 through December 31, 2008. These clubs are owned by Mr. C.O. Vallet (Vallet). Vallet opened Cowboy's in 1991 and Yesterdays in 2001. Cowboy's catered to the local college crowd and was only open on Thursdays and Saturdays. It had a maximum seating capacity of approximately 1,000. Cowboy's did not have any bands perform for its customers but offered various promotions, giveaways, free cover charges and drink specials such as beer-dollar-night on Thursdays. Yesterdays was a smaller club with a capacity of approximately 350, catering largely to an older crowd. It hired bands to attract customers and also offered giveaways, promotions, and incentives to attract customers.

These enterprises were cash businesses. At the end of each business night the managers would count the cash taken in and compare that count to the amount reflected on the registers' tapes known as "Z-tapes." The cash was then placed in a safe, on-site, and deposited in the bank on Mondays. From the beginning of these business operations until the Collector's audit, a period of some twenty years, Vallet routinely provided the deposit receipts and bank statements of these businesses to his CPA as his records for the preparation of federal, state, and local sales tax returns. The State of Louisiana, acting through the Department of Revenue (LDR), never raised any question regarding the subject tax years; and, after conducting its own audit in 2008, found no additional taxes were due by the

clubs. Vallet submitted the same documents to LDR for its audit which included bank statements and deposit slips he provided to the Collector. The parties stipulated Yesterdays reported total sales of $2,249,098.00 for the tax period at issue and paid total sales taxes to the School Board of $107,637.94. Cowboy's reported annual sales of $3,945,053.00 and paid School Board taxes totaling $188,951.00 for the period at issue. The parties also stipulated, for the same period, Yesterdays paid state sales taxes totaling $89,964.00 and Cowboy's paid the state $157,801.00.

The Collector claims Vallet's two businesses were "randomly" selected for audit. The odds that both of Vallet's clubs were randomly selected for audit out of all such businesses in Calcasieu Parish seem to the clubs' owner as likely as perhaps, picking the right power ball numbers and winning the Lotto. Nevertheless, the Collector maintains the clubs were randomly selected. The clubs provided the monthly deposit slips and bank statements to the Collector's auditor as well as copies of the clubs' federal and state tax returns, but the Collector refused to accept such information as sufficient proof. Purportedly acting under its authority by virtue of La.R.S. 47:337.35, the Collector requested the Clubs agree to a three-month-per-year sample audit of the years in question. The Collector made no indication that it was acting under the provisions of La.R.S. 47:337.28. The Collector's audit resulted in an increased tax for both clubs with taxes, interest, and penalties for Yesterdays totaling $155,662.95 and for Cowboy's totaling $49,973.99. The clubs filed suit attacking the final assessments and the methodology used in reaching them.

The trial court ruled in favor of Yesterdays and Cowboy's, and deferred a ruling on the issue of attorney fees due Plaintiffs. The Collector filed a motion for

new trial which the trial court denied. At the hearing on the motion for new trial, the court awarded attorney fees to Plaintiffs pursuant to La.R.S. 47:337.13.1(B)(1). The Collector appeals the trial court judgment. For the reasons stated below we affirm the trial court's ruling.

## ANALYSIS

The Collector asserts the trial court erred as a matter of law in finding the statutory provisions on recordkeeping ambiguous, and in finding the clubs' bank statements alone without additional documentation were "suitable records" for tax determination under the state tax laws. The Collector also asserts the clubs were required to keep their "Z- tapes" from the registers for the required period of time as suitable records. We disagree. It is undisputed no notices, prior to the subject audits, were sent to the clubs' owner requiring he keep these records as the only suitable financial documentation that would satisfy the Collector in the event of an audit. Further, the taxing authority could have promulgated a "Z-tape only" rule but never did. The first Notice of Assessment for Yesterdays' tax, dated January 19, 2010, was for $217,190.49 and with interest and penalties totaled $376,088.65. This number was reduced to $115,712.16 in the first Amended Assessment on July 10, 2010, then lowered to $92,362.81 on July 29, 2010, in the second Amended Assessment, and finally assessed at $85,353.60 on August 26, 2010. With interest and penalties the final assessment resulted in a tax bill for Yesterdays totaling $155,662.95. In the Collector's initial Notice of Assessment for Cowboy's, issued on January 19, 2010, the amount due was assessed at $219,161.87 and with interest and penalties totaled $366,989.50. The first Amended Assessment dated July 10, 2010 lowered the assessed amount to $56,183.17; the second Amended Assessment again lowered the amount to $35,415.15; and the Final Assessment for

3

Cowboy's was for $29,292.42. With interest and penalties added to the tax assessed the final total claimed by the Collector for Cowboy's was $49,973.99.

The Collector asserts the trial court legally erred in shifting the burden of proof to the Collector by finding that R.S. 47:337.29 is ambiguous. We disagree, and find the record supports the trial court judgment which was not manifestly erroneous nor was it legally incorrect.

> [T]ax statutes are to be interpreted liberally in favor of the taxpayer, and if the statute can reasonably be interpreted more than one way, *the interpretation less onerous to the taxpayer shall be adopted. Tarver v. E.I. Du Pont de Nemours and Co.*, 616 So.2d 216 (La.App. 5 Cir. 1993), *affirmed* 93-1005 (La. 3/24/95); 634 So.2d 356.

*Clyde Juneau co., Inc. v. Caddo-Shreveport Sales and Use Tax Comm'n,* 28433, p. 6 (La.App. 2 Cir. 6/26/96), 677 So.2d 610, 613 (emphasis added).

Because these tax statutes provide for the imposition of penalties on a taxpayer found to be in violation of the statutes, they must be strictly construed. *Gibbs Constr. Co., Inc. v. State*, *Dep't of Labor*, 540 So.2d 268 (La.1989). Louisiana Revised Statutes 47:337.29 provides:

> A. (1) Every dealer required to make a report and pay any tax under this Chapter shall keep and preserve suitable records of the sales, purchases, or leases taxable pursuant to this Chapter, and such other books of accounts as may be necessary to determine the amount of tax due hereunder, and other information as may be required by the collector; and each dealer shall secure, maintain and keep until the taxes to which they relate have prescribed, a complete record of tangible personal property received, used, sold at retail, distributed, or stored, leased or rented, within the taxing jurisdiction by the said dealer, together with invoices, bills of lading, and other pertinent records and papers as may be required by the collector for the reasonable administration of the tax, and a complete record of all sales or purchases of services taxable as provided in this Chapter until the taxes to which they relate have prescribed.
>
> (2) These records shall be open for inspection to the collector at all reasonable hours.

(3) The collector is authorized to require all dealers who take deductions on their sales tax returns for total sales under the minimum taxable bracket prescribed pursuant to R.S. 47:304 to support their deductions by keeping written or printed detailed records of said sales in addition to their usual books and accounts.

B. Any dealer subject to the provisions of this Chapter who violates the provisions of this Section shall be fined not more than five hundred dollars or imprisoned for not more than sixty days, or both, for any such offense.

The statute refers only to "suitable records," "other books of accounts," and "other information as may be required by the collector[.]" These are all ambiguous, ill-defined terms which give no clear instruction to the taxpayer as to what specific records and/or documents will be acceptable, let alone required, to determine taxes owed in the event of an audit. The Collector could have easily published a list of required records/documents but did not do so until after its assessment of Vallet's businesses. Moreover, the Louisiana Department of Revenue, the United States Internal Revenue Service, and even the Collector have been satisfied for some twenty (20) years with this taxpayer's filings based only on the very records he supplied to the Collector in this audit.

Additionally, we note this statute does not require a taxpayer to keep "the best evidence" as the Collector suggests, rather, it requires only "suitable records," which term is not defined nor made more specific by any promulgations from the Collector prior to these assessments or by any other taxing authority. Evidence submitted at trial demonstrated the Collector has for quite some time been aware that taxpayers, operating a business within the Parish's jurisdiction, have expressed uncertainty as to what constitutes "suitable records" of sales. In an August 2004 edition of the Calcasieu Parish School System Sales & Use Tax Department publication the taxing authority stated:

5

More and more often we find that businesses are not keeping adequate records in accordance with applicable tax laws. For local sales and use tax purposes, R.S. 47:337.29 states that every dealer required to make a report in paying a tax shall keep and preserve suitable records of the sales, purchases, or leases taxable under various local tax ordinances. Dealers may obtain a fairly detailed listing of records customarily maintained by entrepreneurs from their local tax office (soon to be on our website www.calcasieuusalestax.org).

In response to the taxpayers' uncertainty about the meaning of "suitable records," the Collector merely recited the same vague language of the state statute and referred them to a *non-existent* list of suitable records. The Collector offered no evidence or testimony of any actual lists that it had ever published prior to these audits. Additionally, Kathy Pettis (Pettis), the Collector's former audit supervisor, testified that bank statements, deposit slips, and tax returns are recognized as sales records by the Louisiana Association of Tax Administrators (LATA). The Collector's own Association uses LATA's guidelines to teach its representatives how to audit a bar business.

We are also unconvinced by the Collector's cases cited and note the cases do not support its argument. In *Calcasieu Parish School Board v. Parker*, 02-339 p.6 (La.App. 3 Cir. 10/2/02), 827 So.2d 543, 546-47 (emphasis added) we held:

> Pursuant to Louisiana Revised Statute 47:309, it is the duty of the retailer to keep and preserve suitable records until the taxes to which they relate have prescribed. Parker cannot now complain that an arbitrary assessment was inequitable when it was his duty to maintain records. *With no records* to determine what his actual sales were, the School Board had the right to utilize some method of determining what taxable sales Parker had for the audit period. *Schwegmann Bros. Giant Super Mkts., Inc. v. Mouton,* 309 So.2d 686 (La.App. 4 Cir.1974), *writs denied,* 310 So.2d 845 (La.1975). We do not find that the method used by the School Board was unconscionable or inequitable.

In *Parker*, 546 So.2d at 546, unlike in the present case, the taxpayer "could not produce 440 invoices out of a total sequenced number of 616 [invoices]." Thus

Parker had virtually no records on which a determination could be made. In *Schwegmann Bros. Giant Super Markets, Inc. v. Mouton,* 309 So.2d 686 (La.App. 4 Cir. 1974), *writ denied*, 310 So.2d 845 (La.1975), the court held Schwegmann's method of collecting and calculating its sales tax liability "was not in compliance with any of the methods accepted by the Collector." *Id*. at 689. Unlike the taxpayer in the present case, Schwegmann's knew exactly what the acceptable methods were and knew if it desired to use a different method it was required to secure approval from the Collector. Additionally, in *Schwegmann*, the only evidence offered to refute the Collector's audit results, which were based on register tapes of actual sales in the taxpayer's store on low volume days and high volume days, was the testimony of a Schwegmann's executive who admitted:

> . . . [His] lack of knowledge as to the method of how [Schwegmann's] figure was computed; he relied entirely upon a figure derived in some unknown manner by an unnamed person whose only stated qualification was an unnamed degree from the University of Alabama. It is significant to note Schwegmann offered no audit or other figures of its own to contradict the Collector's audit, which remained effectively unimpeached.

*Id*. at 691.

This taxpayer did what he and his CPA had done for years, and what he reasonably understood to be sufficient books and records which included bank statements and deposit slips. If the Collector required businesses such as these clubs to keep their "Z-tapes" then it could have promulgated such a requirement or at least informed taxpayers in writing that only this record would constitute a "suitable record" for tax purposes. It did not. It was simply unfair to ambush them after-the-fact and demand only the production of "Z-tapes" as proof of total sales. The bank deposit method of proof has long been used by the federal government to establish proof of taxes owed by a taxpayer. *United States v. Dorsey*, 499 Fed.

7

Appx. 176, 178 (3rd Cir. 2012). Nothing put Vallet on notice that his method of record keeping, which he used for many years without question and which always proved satisfactory to all taxing authorities, would suddenly become unacceptable to the local taxing authority. The trial court specifically found Vallet did not commit any fraud in declaring the amount of sales. Indeed, the record establishes this taxpayer fully cooperated with the Collector during the audit process and the Collector admitted that the amount of sales shown on the taxpayer's bank statements and deposit slips were as represented in the taxpayer's returns.

We also disagree with the Collector's argument that the trial court committed legal error in finding "the Collector's arbitrary tax calculation methodology was improper." The statute does not grant Collectors in this circumstance the authority to make an arbitrary estimate of the clubs' retail sales during the disputed periods. Louisiana Revised Statutes 47:337.28(A) provides in pertinent part "or in the case the dealer makes a **grossly incorrect** report or a report that is false or fraudulent, the collector shall make an estimate of the retail sales of such dealer for the taxable period…" (Emphasis added). *Inadequate, generally speaking, and incorrect are not terms synonymous with fraud or grossly incorrect. The LDR did not think the taxpayer's reported income was "incorrect," much less "inadequate," or more to the point, inaccurate.* As the taxing authority for the state, it was satisfied that the records supplied by the taxpayer in support of its state filings were satisfactory and resulted in no adjustment in the state's audit. Even the Collector admitted it came up with the first numbers to shock and get the owner's attention. These numbers proved to be very far off the mark, even under the method finally relied upon by the Collector.

The Collector did not comply with the statutory requirements of La.R.S. 47:337.35 (emphasis added):

> A. As soon as practicable after each return or report is filed under any of the provisions of this Chapter, the collector shall cause it to be examined and may make such further audit or investigation as he may deem necessary for the purpose of determining the correct amount of tax.

> B. The taxpayer and the collector or his designee may enter into a binding agreement to use a sampling procedure as a basis for projecting audit findings, which may result in either an underpayment or overpayment of tax.

> C. (1) *Before using a sampling procedure to project the findings of an audit and establish a tax liability, the collector or his designee shall notify the taxpayer in writing of the sampling procedure he intends to use, including but not limited to how the tax will be computed, the population to be sampled, and the type of tax for which the tax liability will be established.*

> *(2) The sampling procedure used shall produce a sample which shall reflect as nearly as possible the normal conditions under which the business was operated during the period to which the audit applies. If either the taxpayer or the collector can demonstrate that a transaction in a sample for a particular time period is not representative of the taxpayer's business operations during that time period, the transaction shall be eliminated from the sample and shall be separately determined in the audit.*

> *(3) If the taxpayer demonstrates that any sampling procedure used by the collector was not developed or applied in accordance with generally recognized sampling techniques, that portion of the audit established by a projection based upon the development or application of the disputed sampling procedure shall be replaced by a projection based upon a new sample that conforms to generally recognized sampling techniques.*

> *(4) Generally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants shall be used as guidance in developing audit sampling techniques for purposes of this Section.*

The Collector produced no evidence that Yesterdays and Cowboy's agreed in writing, prior to commencement of the audit, with his methodology for computing taxes allegedly owed. In fact, Ms. Pettis testified the Collector did not

give written notice to this taxpayer as to how the tax would be computed as required, but stated she "understand[s] now" that such *should have been done*. Further, Pettis, and Jonathon Thomas (Thomas), the field auditor conducting these audits, provided ample basis for the trial court's finding that the methodology used by the Collector did not "reflect as nearly as possible the normal conditions under which the business was operated during the period to which the audit applie[d]." *See* La.R.S. 47:337.35(C)(2). Thomas testified he initially gave no allowance for spillage, breakage, self-consumption and giveaways. He admitted the amount listed in the original Notice of Intent to audit Cowboy's was grossly overstated. Although he refused to admit the same regarding Yesterdays, the amount in the original Notice of Intent when compared to the final assessment, was also overstated. He also admitted the 2010 "Z-tape" information he used as samplings upon which he based his calculations for the four-year audit period were taken from Yesterdays after it was rebuilt into a much larger facility with much greater capacity than the old club. Thomas also admitted he did not know the patron capacity for the new club but agreed it was much larger than the old one. Despite this acknowledgement, he refused to admit this information was critical to a good estimation of business income during the audit period, and that it should have put him on notice that his audit figures were questionable. If the new club had more than double the capacity of the old club, it is not reasonable to conclude the old club's nightly patron count would be more than double the new as his audit figures suggest. Thomas admitted he had no knowledge of the operations of the bar and never talked to anyone with either club about their operations. Pettis and Thomas testified it was not required that they have any understanding of how these businesses operated because they just based their determinations of the taxes due

on "what [the clubs] actually purchased" in liquor amounts, their theory being, if one purchased the liquor one sold the liquor, end of calculation. Based on the methodology used by Pettis and Thomas the auditor determined Yesterdays had 610 people a night for every night it was open during the four-year audit period. Yet it is undisputed that the maximum capacity of Yesterdays during the audit period was 350 people. Pettis explained they did not know the capacity of Yesterdays because when they asked the fire department for that information it did not know and "it never got back to them on the subject." The auditor admitted he did not ask anyone else for that information nor did Pettis. As noted, Pettis insisted such information ultimately was not relevant because the amount of liquor the clubs purchased was a proper factor to use in estimating the amount of liquor sold. She admitted when conducting the audit she and Thomas had no knowledge of how these businesses operated. She knew nothing about *dollar nights, self-consumption for employees, breakage, spillage, how many nights a week they were open, which nights are busier, and maximum capacity of the clubs*. When asked if she could provide the court with the generally accepted sampling techniques, and the American Institute of Certified Public Accountants standards used in these audits, Pettis replied: "I can't do that, but I talked to his CPA who has access to all of that, and he never once offered a different way of doing it, a proposal." She then quipped it is the Collector's "duty to determine the correct amount of tax" owed in an audit.

Pettis also testified she did not think the 610 people a night audit numbers for Yesterdays was off-base even when asked to consider the 2010 sample Z-tapes showed only a nightly average of 300 people, for the new club twice as big in size, with more than double the capacity of the old club. This figure was used in the

11

audit to calculate proceeds earned from door cover charges as well as number of drinks sold. Vallet testified the typical numbers for Yesterdays during the audit period was 150 to 200 on Friday nights, 250 to 300 on Saturday nights, and 60 to 70 on Sunday nights. He explained that Sunday nights were not profitable nights and catered to an older crowd between ages 60-80. The capacity of the new Yesterdays was 1,000 people. He explained that he took issue with the auditor's method because it was so extreme and off-base. The auditors maintained the hard liquor purchased was sold at a 300% profit. But Vallet pointed out that 70% of his business was on dollar-night for dollar-beer. He explained that beer costs about .80 cents a bottle and sells for $1.00 a bottle. He further testified the old Yesterdays never did a $78,000.00 night as stated in the audit. The average was more like $40,000.00, considering the high and low nights. He also disputed the auditors' assessment of $700,000.00 a year profit for Yesterdays when the building was "50 years old with a capacity of 350 people." He testified had Yesterdays been making that kind of profit he never would have closed it, maintaining he closed it because it was not profitable. According to Vallet, the building was condemned and he was ordered to tear to it down. That was the reason he built a new establishment.

Based upon the foregoing we cannot say the trial judge manifestly erred in concluding the Collector failed to meet the requirements of La.R.S. 47:337.35. Moreover, given the incredible disparity between the initial and final assessments, and the Collector's failure to use a methodology for auditing the clubs that would have "reflect[ed] as nearly as possible the normal conditions under which the business was operated during the period to which the audit applie[d]," we reject its argument that the trial court erred in pointing to the discrepancy between the initial

and final assessment of the clubs as a basis for finding the Collector should have used a different and more acceptable methodology in calculating the taxes, interest and penalties.

Further, the Collector asks that we take judicial notice that the last suspension agreement[1] affecting Yesterdays was executed but was lost, and that we therefore find such an agreement existed as to both clubs since the agreement as to Cowboy's was introduced in evidence and interrupted prescription. We will not take judicial notice of that which is not shown to exist, and we will not infer that because a taxpayer signed one document he signed another. Proof of waiver of prescription requires more than supposition. We therefore find no manifest error in the trial court's ruling that the 2005 and 2006 taxes as to Yesterdays have prescribed. Louisiana Revised Statutes 47: 337.28.1(emphasis added), in relevant part provides:

> B. If the assessment by the collector is determined by a court of competent jurisdiction to be an arbitrary assessment, **the assessment shall neither interrupt nor suspend prescription**, and the dealer shall be reimbursed by the collector for reasonable costs of litigation. The amount of costs recoverable under this Section shall

---

[1] During trial it was discovered in conversations between the attorneys that the Collector was no longer in possession of a document entitled "Agreement to Suspend Prescription of Sales and Use Taxes Administered by the Calcasieu Parish School System" (Suspension Agreement) pertaining to Yesterdays. The Collector asserted that this Suspension Agreement, purportedly signed by the taxpayer, extended the prescriptive period for Yesterdays to December 31, 2010, for the tax years 2005 and 2006. Yesterdays had filed an Amended Petition, unopposed, alleging prescription for the tax years 2005 and 2006. The trial court found the claims against Yesterdays for 2005 and 2006 taxes were prescribed on their face, thus the burden was on the Collector to establish the claims were not prescribed. "Taxes, except real property taxes, and licenses shall prescribe in three years after the thirty-first day of December in the year in which they are due, but prescription may be interrupted or suspended as provided by law." La. Const. Art. 7, § 16. The Collector is also given three years to bring an action against a taxpayer for unpaid or underpaid taxes through the provisions of Louisiana Revised Statutes 47:337.67, which provides for the interruption or suspension of prescription. Louisiana Revised Statutes 47:337.75(B)(2) (emphasis added) defines a false or fraudulent return as "any report filed with the *intent* to evade taxes, or a willful attempt to defraud or evade taxes that are due." This statute includes the element of scienter and we agree with the trial court's finding there is no evidence "to suggest that [Vallet] filed any report with the intent to evade or defraud taxes that were due." The trial court specifically found Vallet was "both honest and forthcoming" throughout the trial. We find no manifest error in the trial court's ruling.

not exceed ten percent of the taxes, interest, and penalty that were arbitrarily assessed, which amount shall be subject to the discretion of the court as to reasonableness.

C. No assessment shall be made under this Chapter for the purpose of depriving a taxpayer of his constitutional right to a three-year prescriptive period for the assessment of tax in accordance with Article VII, Section 16 of the Constitution of Louisiana.

Moreover, we find that the provisions of La.R.S. 47:337.28.1 prohibit arbitrary assessments such as occurred in this case. The taxpayer provided sufficient records in light of the lack of any notice from the Collector throughout many years that the only records sufficient to show revenue would be "Z-tapes."

We also find no error in the trial court's denial of the Collector's motion for new trial. "When reviewing the grant or denial of a motion for new trial, an appellate court cannot reverse the trial court's decision unless an abuse of discretion can be demonstrated." *Boudreaux v. Cummings*, 14-421, p.3 (La.App. 3 Cir. 1/14/15), __So.3d__, (citing *Whittington v. OBE Specialty Ins. Co.*, 12-409, (La.App. 3 Cir. 11/7/12), 105 So.3d 797, *writ denied*, 12-2646 (La.1/25/13), 105 So.3d 723. Louisiana Code of Civil Procedure Article 1972 sets forth, in pertinent part, the peremptory grounds for a motion for new trial: "(2) When the party has discovered, since trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during trial." In *Boudreaux*, __So.3d__, we set forth a movant's burden of proof to establish grounds for a new trial based on newly discovered evidence:

"(1) [T]hat the evidence was discovered after the trial; (2) that the new evidence is not cumulative; (3) that the new evidence would tend to change the result of the case; and (4) that the new evidence could not have been discovered with due diligence before the trial was completed. (citation omitted)

*Id.* at __.

The trial court did not abuse its discretion in concluding the Collector failed to carry its burden to prove the evidence it asserted was newly discovered was not discoverable earlier by due diligence. The Collector was aware during the audit that Vallet made payments to bands, bouncers, and sheriff's deputies but it made no effort to timely procure the evidence it asserted was a basis for a new trial. The evidence was discoverable by due diligence before the final audit assessment was issued and litigated.

For the reasons stated we affirm the trial court's ruling and assess the costs of this appeal against the Collector.

**AFFIRMED.**

YESTERDAYS OF LAKE CHARLES, INC.

VERSUS

CALCASIEU PARISH SALES AND USE TAX DEPARTMENT


CONSOLIDATED WITH


NUMBER 14-414


COWBOY'S NIGHTLIFE, INC.

VERSUS

CALCASIEU PARISH SALES AND USE TAX DEPARTMENT


AMY, J., dissenting.

I respectfully dissent from the majority opinion as I find that a reversal is required. Importantly, Louisiana Revised Statutes 47:337.29(A)(1) specifically provides requires a "dealer" to maintain certain records regarding tangible property sold at retail, including invoices. *See also* La.Admin. Code Title 61, Part 1 § 4359 (requiring the retention of all sales invoices as well as records pertaining to the services performed for/by others, among other records, necessary for the determination of the correct tax liability). Thus, in my opinion, the trial court erred in determining that the tax collector was required to demonstrate that the bank records relied upon by the taxpayer, alone, did not constitute suitable records. Instead, La.R.S. 47:337.29(A)(1) clearly anticipates the retention of more specific inventory, sales, and service records.

Given the absence of suitable records, and in light of the tax collector's determination that the taxpayer's previously-filed returns were grossly inadequate,

La.R.S. 47:337.28(A) permits the tax collector to estimate the retail sales. In this case, the taxpayer did not, in turn, demonstrate that the tax collector's estimate was not in compliance with the law. *See* La.R.S. 47:337.28.1(A).

Thus, finding error in the trial court's appreciation of the burdens associated with the pertinent statutory guidance, I would reverse the trial court's judgment on the merits as well as the attendant award of attorney fees. I would thereafter review the matter de novo and enter judgment reflecting taxes, interest, and penalties in favor of the tax collector. However, that ruling would reflect the trial court's determination that the tax collector's claims against Yesterdays of Lake Charles had prescribed for the tax years of 2005-06. In my opinion, the trial court was not manifestly erroneous in finding a lack of evidence/documentation of the suspension of prescription by the taxpayer. Neither do I find a judicial confession in that regard.

For these reasons, I respectfully dissent from the majority opinion.

NUMBER 14-413 c/w 14-414

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

14-413

YESTERDAYS OF LAKE CHARLES, INC.

VERSUS

CALCASIEU PARISH SALES AND USE TAX DEPARTMENT

CONSOLIDATED WITH

14-414

COWBOY'S NIGHTLIFE, INC.

VERSUS

CALCASIEU PARISH SALES AND USE TAX DEPARTMENT

CONERY, J., dissenting.

I respectfully dissent. In my opinion, the majority shifts the burden in a tax dispute case from the Taxpayer to the Collector. In effect, the majority allows the practice of a taxpayer in a cash business using cash register receipts for each transaction for his own purposes, to then disregard the receipts, pay whatever "expenses" he chooses out of the cash receipts, deposit the balance in the bank, and then use BANK RECORDS of his NET DEPOSITS as adequate records for sales tax audit purposes. We cannot condone such a practice, nor does the law allow us to do so.

***Assignment of Error One***

The Collector correctly asserted in its assignment of error one that "the trial court erred in holding that a cash-based business may comply with the

recordkeeping requirement of La.R.S. 47:337.29 by destroying records of actual gross sales and keeping only net bank deposit records."

Louisiana Revised Statutes 47:337.29 and its implementing regulation, La. Admin.Code Tit. 61, pt. 1 § 4359, provide the basis for the record keeping requirements for establishments such as Yesterdays and Cowboys. La.R.S. 47:337.29 provides in pertinent part (emphasis added):

> A. (1) Every dealer required to make a report and pay any tax under this Chapter shall keep and preserve **suitable records** of the sales, purchases, or leases taxable pursuant to this Chapter, **and such other books of accounts as may be necessary to determine the amount of tax due hereunder**, and other information as may be required by the collector; and **each dealer shall secure, maintain and keep until the taxes to which they relate have prescribed, a complete record of tangible personal property** received, used, **sold at retail**, distributed, or stored, leased or rented, within the taxing jurisdiction by the said dealer, **together with invoices, bills of lading, and other pertinent records and papers as may be required by the collector** for the reasonable administration of the tax, and a **complete record of all sales or purchases of services taxable as provided** in this Chapter until the taxes to which they relate have prescribed.

Louisiana Administrative Code, Title 61, Part 1 § 4359 provides in pertinent part (emphasis added):

> A. As provided in R.S. 47:309 and R.S. 47:337.29, every person required to collect or remit the tax imposed under R.S. 47:302, 321, 331, and local ordinances **shall keep a permanent record of all transactions in sufficient detail to be of value in determining the correct tax liability.** The records to be kept shall include **all sales invoices**, purchase orders, merchandise records, inventory records, credit memoranda, debit memoranda, bills of lading, shipping records, and all **other records pertaining to any and all purchases, sales**, or use of tangible personal property whether or not the person believes them to be subject to state or local sales or use tax. Full detail must be kept of all property leased or rented from or to others and **all services performed for or by others**. They must also keep all summaries' recapitulations, totals, journal entries, ledger accounts, accounts receivable records, accounts payable records, statements, tax returns, and other documents listing, summarizing, or pertaining to such sales, purchases, inventories, shipments, or other transactions dealing with tangible personal property.

2

The trial court found that evidence presented at trial established the system used by the Clubs for the reporting and remitting of sales taxes as follows:

> To **account for cash from sales**, the managers would meet at the end of the night with the bartenders, each of whom was assigned a cash register. The bartenders would **each bring the drawer from their register, along with the register's "Z-tape." The manager would count the cash and match the total against the Z-tape.** The cash was then placed into a safe located on the premises of the nightclubs. On the following Monday, the cash was deposited by the managers into each of the [Clubs'] respective bank accounts. Mr. Vallet testified that it was solely the managers' responsibility to deposit the cash. The [Clubs'] CPA was then given the deposit receipts and monthly bank statements. The CPA would then report the deposits as the [Clubs'] taxable sales, multiply that amount by the applicable tax rate, and remit that result as sales taxes.

(Emphasis added.)

The trial court noted Mr. Vallet's long history of ownership of both the Clubs, Cowboy's since 1991 and Yesterdays since 2001. The court also noted that "based upon the advice of his CPA, he has used the abovementioned system for reporting and remitting sales taxes. At no point prior to the audit period in question was this system deemed unacceptable by the Collector."

The trial court found that La.R.S. 47:337.29(A)(1) contained no definition "as to what qualifies as suitable records under the statute." Furthermore, "because the Collector provided no guidance prior to the audit period in question as to what specific records were to be maintained," the trial court found "the terms 'suitable records' under La.R.S. 47:337.29(A)(1) to be ambiguous."

The trial court also found that the Collector was remiss in failing to adopt "a formal set of rules or regulations detailing to the public exactly what constitutes the requisite suitable records." Further, the trial court found "the Collector failed to produce any evidence that would indicate to entities such [as] these (bars and nightclubs) what constituted the requisite suitable records or that the

3

abovementioned system for reporting and remitting sales taxes was insufficient."

In support of its conclusion there was "simply nothing that would indicate to the [Clubs] that their tax reporting system was improper or incorrect," the trial court pointed out that the March 2013, "Calcasieu Tax Review, the month in which this trial began, the Collector posited for the first time that bank statements alone did not constitute suitable records."

In conclusion, the trial court found:

It is well settled that the tax statutes are to be liberally interpreted in favor of the taxpayer. Uncertainty in statutory language must be resolved against the taxing authority and in favor of the taxpayer. *Clyde Juneau Company, Inc. v. Caddo-Shreveport Sales and Use Tax Commission*, 28,433 (La.App.2d Cir. 6/26/96), 677 So.2d 610 . . . Thus, under these circumstances, the Court finds that [Clubs] maintained suitable records and [were] in compliance with La. R.S. 47:337.29.

The majority apparently agreed with the trial court's analysis. However, the supreme court in *Cleco Evangeline, LLC v. Louisiana Tax Commission*, 01-2162, p. 5 (La. 4/3/02), 813 So.2d 351, 354, discussed the application of statutory construction and stated:

It is a well-established principle of statutory construction that absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language. See *United States v. Apfelbaum*, 445 U.S. 115, 121, 100 S.Ct. 948, 952 (1980). When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. LSA-C.C. art. 9. This principle applies to tax statutes. *Tarver v. E.I. DuPont De Nemours and Company*, 93-1005, p.3 (La. 3/24/94), 636 So.2d 356, 358.

It is clear from the trial court's reasons that it found that bank statements alone, without any additional documentation, were "suitable" under the provisions of La.R.S. 47:337.29 and were acceptable for the calculation of the taxes owed by the Clubs. Although the trial court found the term "suitable" to be "ambiguous,"

the plain words of both the statute and its' implementing regulation, La. Admin. Code Tit. 61, pt. 1 § 4359, clearly use the mandatory "**shall**" in requiring specific documentation to be kept by the Clubs, including for "**all sales**" as well as "**all services performed for or by others**," which would include payments to the sheriff's deputies and bouncers hired for security, the bands performing at the Clubs, as well as all the "free give aways" to various groups and organizations. (Emphasis added.)

It should be noted at this juncture that the Clubs had never been audited by the Collector.[1] There is no requirement under the law requiring the Collector to tell the taxpayer exactly what records to maintain. To the contrary, the statute in question places that responsibility directly on the Clubs. As to the excuse that Mr. Vallet relied on his CPA and didn't know what records to keep, we apply the Latin maxim, ignorantia juris non excusat, (commonly interpreted as "ignorance of the law is no excuse"). BLACK'S LAW DICTIONARY 712(9th ed. 2009). Louisiana has long since codified that maxim into its law. *See* La.Civ.Code art. 5;[2] *Soileau v. La. Paving Co. Inc.*, 488 So.2d 1166 (La. App. 3 Cir. 1986).

The "z-tapes" from the cash registers at the door of both Clubs correctly calculated the exact amount of cover charges collected and Mr. Vallet, in accordance with the statutes at issue, was clearly required to keep such records, as well as records for services provided by the bands and the security provided by the sheriff's deputies and bouncers. Likewise, Mr. Vallet also had the actual cash

---

[1] The State did conduct an "audit" at one point, but there is no specific evidence in the record as to what was considered or whether the State even looked at the issue of the destroyed z-tapes.

[2] Louisiana Civil Code Article 5 provides, "No one may avail himself of ignorance of the law."

5

register "z-tapes" which he used to calculate bar sales for his own purposes, yet he inexplicably destroyed those records of actual cash sales as well.

Although the trial court found that the failure of Mr. Vallet to keep these z-tape records was "nothing more than an honest mistake, and that this was not done for the purpose and intent to evade taxes," this conduct still does not excuse Mr. Vallet from maintaining the required records under the clear statutory mandate in La.R.S. 47:337.29 and La. Admin. Code Tit. 61, pt. 1 § 4359, regardless of his actual intent.

The documentation necessary for the Clubs to meet the requirements for record keeping were readily available in the "z-tapes" which the trial court found were a part of the system utilized by the Clubs to maintain their nightly records. Mr. Vallet admitted that **he** used the "z-tapes" to prevent employee theft by making sure the bartenders and managers had cash in the register to match the sales totals on the "z-tapes." Mr. Vallet testified that he even gave the bartenders a $10.00 nightly leeway on drink sales when the cash was balanced against the "z-tapes." However, Mr. Vallet testified that the "z-tapes" were not kept with the nightly receipts or sent to the Clubs' CPA for comparison with the bank deposits, **but were destroyed**.

Therefore, I would hold that the trial court committed reversible error in its' legal determination that La.R.S. 47:337.29 was ambiguous, thus shifting the burden to the Collector to prove that bank statements alone did not constitute "suitable records." The **burden of proving that it kept suitable records is squarely on the taxpayer, not the Collector**.

6

***The Application of La.R.S. 47:337.28, La.R.S. 47:337.28.1, and La.R.S. 47:337.35***

The Collector in assignment of error two claimed that the trial court committed an error of law in holding that "the Collector's arbitrary tax calculation methodology was improper." I agree.

Louisiana Revised Statutes 47:337.28(A), cited by the trial court in its reasons, required the Collector to estimate the retail sales of a dealer who makes a "grossly incorrect report **or** a report that is false or fraudulent." The Statute provides in pertinent part:

> **A.** In the event any dealer fails to make a report and pay the tax as provided in this Chapter **or in case the dealer makes a grossly incorrect report or a report that is false or fraudulent**, the collector shall make an estimate of the retail sales of such dealer for the taxable period . . . and **of the gross amounts paid or charged for services taxable**; and it shall be the duty of the collector to assess and collect the tax together with any interest and penalty that may have accrued thereon, **which assessment shall be considered prima facie correct and the burden to show the contrary shall rest upon the dealer.**

(Emphasis added.)

Thus, under the clear wording of the statute if, as here, the Collector determines that the Clubs filed a "grossly incorrect report," the Collector shall make an estimate of the retail sales of such dealer for the taxable period." There is no additional requirement that the Collector must **also** establish that the Clubs' report is "false or fraudulent." The word "**or**" has a clear meaning in the statute. I would likewise find that the trial court committed legal error in imposing the burden on the Collector to prove the Clubs' report was false or fraudulent. Rather, I would find that based on the record evidence, the Clubs' report was "grossly incorrect" under the statute at issue. When the Collector does assess the tax owed, La.R.S. 47:337.28(A) clearly provides that the Collector's "assessment shall be

considered prima facie correct and the burden to show the contrary shall rest upon the dealer."

It is an undisputed fact that the Clubs failed to pay the taxes due on the cash payments to the security personnel, which included the sheriff's deputies and the bouncers, as well as taxes due on the payments made to the bands that played at the Clubs. Thus, La.R.S. 47:337.28(A) applied and required the Collector to conduct the audit of the Clubs. It also provided that the assessment made by the Collector "shall be considered prima facie correct." The burden to show that the Collector's assessment of taxes owed was erroneous was squarely placed on the Clubs by virtue of the clear language of the statute. The Collector's assessment correctly determined that the Club's record keeping of its sales was also "grossly incorrect."

Louisiana Revised Statutes 47:337.28.1 prohibits the Collector from "issuing an arbitrary assessment." Louisiana Revised Statutes 47:337.28.1(A) further provides:

> **A.** Notwithstanding any provision of this Chapter to the contrary, the collector shall be prohibited from issuing an arbitrary assessment. For purposes of this Chapter, the term "arbitrary assessment" shall mean an estimated assessment issued by the local collector which does not comply with R.S. 47:337.28, 337.48(A), or 337.53. **However, no provision of this Chapter shall prevent the collector from determining correct tax as provided for in R.S. 47:337.35. An assessment shall not be considered an "arbitrary assessment" if the taxpayer does not provide records as required by R.S. 47:337.29 and/or R.S. 47:337.36. The taxpayer shall bear the burden of proving that the assessment was not in compliance with the law.**

(Emphasis added.)

Therefore, pursuant to La.R.S. 47:337.28.1(A), an estimated assessment by the Collector pursuant to La.R.S. 47:337.28 cannot be considered "arbitrary" if, as I would hold in this case, the Clubs failed to provide "suitable records" pursuant to

8

La.R.S. 47:337.29, in this case the "z-tapes," and accurate records of cash payments to security personnel, for bouncers and for bands. As clearly provided in La.R.S. 47:337.28.1(A), the burden is on the Clubs to prove that the assessment by the Collector "was not in compliance with the law." Mr. Vallet admitted destroying the very records he used for the Clubs' internal purposes in calculating sales and balancing the amount sold against the cash collected to prevent employee theft. The Clubs, under these circumstances, could not prove that the Collector's assessment was "not in compliance with the law."

Therefore, the trial court committed legal error when it found, "[H]owever, assuming arguendo that Plaintiffs failed to maintain suitable records, the Collector's arbitrary tax calculation methodology was improper." The trial court improperly shifted the burden of proof when it focused on La.R.S. 47:337.35 in support of its finding that the Collector had engaged in an "arbitrary" estimated assessment.

Louisiana Revised Statutes 47:337.35(C) provides:

C. (1) Before using a sampling procedure to project the findings of an audit and establish a tax liability, the collector or his designee shall notify the taxpayer in writing of the sampling procedure he intends to use, including but not limited to how the tax will be computed, the population to be sampled, and the type of tax for which the tax liability will be established.

(2) The sampling procedure used shall produce a sample which shall reflect as nearly as possible the normal conditions under which the business was operated during the period to which the audit applies. If either the taxpayer or the collector can demonstrate that a transaction in a sample for a particular time period is not representative of the taxpayer's business operations during that time period, the transaction shall be eliminated from the sample and shall be separately determined in the audit.

(3) If the taxpayer demonstrates that any sampling procedure used by the collector was not developed or applied in accordance with generally recognized sampling techniques, that portion of the audit

established by a projection based upon the development or application of the disputed sampling procedure shall be replaced by a projection based upon a new sample that conforms to generally recognized sampling techniques.

(4) Generally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants shall be used as guidance in developing audit sampling techniques for purposes of this Section.

In focusing on La.R.S. 47:337.35(C)(1), the trial court found that the Collector failed to notify the Clubs "in writing" of the sampling procedure the Collector intended to use "[b]efore using a sampling procedure to project the findings of an audit and establish tax liability." The trial court further found, "While the [Clubs] agreed to the fact that the auditor would sample three months for each of the four years at issue, [the Clubs] never agreed to the sampling procedure or how the tax will be computed. In addition, it is undisputed that the sampling procedure was never put into writing." Again, the trial court's analysis, affirmed by the majority, improperly shifted the burden from the Clubs to the Collector to prove its assessment was in compliance with law.

Moreover, the Collector's initial estimated assessments of both Clubs, classified by the trial court as "not a formal assessment," were accompanied by a January 10, 2010 correspondence from Jonathan B. Thomas, Field Auditor for the Collector (Mr. Thomas) to Mr. Darrell Morris, CPA for the Clubs (Mr. Morris). The correspondence included a detailed listing of the audit procedures utilized by the Collector in determining the initial estimated assessments, and followed this introductory statement from Mr. Thomas, which I quote here in pertinent part:

10

Dear Mr. Morris:

Enclosed you will find a Notice of Collector's Intent to Assess for taxes due Calcasieu Parish School System. Audit work papers are attached for your review.

During an examination of Cowboys Night Club and Yesterdays, it was determined that there was a discrepancy in the reporting of sales transactions during the audit period. The information provided to this office indicates the sales were routinely understated which led to the issuance of the Notice of Collector's Intent to Assess for Taxes Due.

The sales tax returns were unable to be reconciled due to the lack of support for the amounts on sales tax returns such as z tapes, shift change reports etc. Consequently, all purchases of beer and liquor had to be reviewed. These purchases were included on the audit and marked up to determine the sales that should have been reported to this office. These sales figures were then used in the calculation to determine the cover charges that should have been reported to as sales. This procedure was used for both Cowboys and Yesterdays.

Upon receipt of the January 10, 2010 correspondence, on February 11, 2010, Mr. Morris, on behalf of the Clubs, timely protested the initial estimated assessment and stated, "We are writing to protest the tax assessment made by the sales tax office, regarding our client [Clubs]. We are appealing the tax, interest, and penalty due per your office. We do not agree with the assumptions your office made concerning prices, entry fees, or amounts of drinks per liter. We are requesting a hearing concerning this audit."

Subsequent to this timely protest by the Clubs, the record reflects documentation received by the Collector from Mr. Morris indicating the loss of inventory and closure of both Clubs due to Hurricanes Rita and Ike. Mr. Morris further provided information to the Collector concerning cover charges and their amounts, giveaways, and free drinks provided for a number of entities, as well as payment for various bands used by the Clubs.

Upon receiving this information from the Clubs, provided gradually over a period of six months, the initial assessment for each Club was reduced a total of three different times over that six month period, as outlined in the trial court's Reasons. Yesterdays' initial assessment of taxes due was reduced from $217,190.49 to $85,353.60. Cowboy's assessment was reduced from $219,161.87 to $29,292.42. The Collector used the proper procedure and decreased assessments upon the receipt of information from the Clubs, who had the burden of proof. *Calcasieu Parish School Bd. v. Parker*, 02-339 (La.App. 3 Cir. 10/2/02), 827 So.2d 543, *writ denied*, 02-2719 (La. 1/10/03), 834 So.2d 440. The Collector then showed positive good faith by reducing its' audit figures based on records supplied gradually by the Clubs.

The trial court, affirmed by the majority, was in error when it found the discrepancy between the initial and the final assessment provided a basis for its finding that the Collector was required to employ an alternative methodology in calculating the taxes, interest and penalties due by the Clubs. The trial court stated:

> Furthermore, the Collector's initial assessment (although not a formal assessment) of Cowboy's unpaid taxes for the period in question was $219,161.87, while its' final assessment was $29,292.87. Based on these figures, the Collector initially overestimated the amount of Cowboy's unpaid taxes by 748%. Such variance creates concern with the Court and warrants a determination as to whether the Collector could have employed an alternative methodology that would produce a more predictable and accurate estimate.

As previously stated, the Collector was required to conduct an estimated audit based on the Clubs lack of suitable records pursuant to La.R.S. 47:337.29 and the failure of the Clubs to report the taxes due for the "services taxable" rendered by the security personnel and the bands pursuant to La.R.S. 47:337.28. Thus, the

12

fact that the original estimated audit was reduced upon information and documentation provided by the Clubs to the Collector does not supply the support necessary for the trial court's determination that the Collector should have used an alternative methodology.

The Clubs had the burden of proof under La.R.S. 47:337.28.1, to maintain suitable records. The trial court was precluded from making a determination that the estimated audit conducted by the Collector was "arbitrary," when the Clubs' actual records were destroyed by its owner. The burden of proof remained with the Clubs to show that the audit conducted by the Collector "was not in compliance with the law." La.R.S. 47:337.28.1(A). The Clubs failed to present any evidence that the audit methods used did not comply with the requirements of either La.R.S. 47:337.28(A) or 47:337.35(A). Neither of these statutes incorporates any specific estimating standards.

Only when a "sampling procedure" is utilized by the Collector, pursuant to La.R.S. 47:337.35(B) and (C), is the Collector required to seek guidance from "[g]enerally recognized sampling techniques and standards set forth by the American Institute of Certified Professional Accountants." The Clubs' CPA, Mr. Morris, presented no testimony at trial to rebut the statutory presumption that the Collector followed the proper sampling techniques utilized in the initial estimated assessment. He additionally did not offer any testimony that the manuals used by the Collector for guidance failed to comply with La.R.S. 47:337.35(C), and did not comport with "[g]enerally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants."

To the contrary, the uncontradicted evidence demonstrated that the initial estimated audit was conducted by the Collector based on a "mark-up analysis from

13

two tax manuals, The California Audit Manuel for Bars and Restaurants and the IRS Audit Technique Guide for Bars and Restaurants." The California Manuel provided, "This is an advisory publication providing directions to staff administering the Sales and Use Tax Law Regulations." The trial court excluded both manuals from evidence, but allowed the Collector to submit both as Defense Proffers 1 and 2. The Collector argued that pursuant to La.Code Evid. art. 801(C), the manuals were not hearsay, but were "offered to show that the auditors consulted generally-recognized accounting techniques in developing their assessment, not to prove the truth of the manuals' contents." The Collector further cited case law in support of its use of the manuals, demonstrating that other jurisdictions had recognized both manuals in similar cases involving the audits of bars and restaurants.[3]

I would find that the trial court erred in its exclusion of the Collector's Defense Proffers 1 and 2, which are obviously relevant to show that the Collector used a methodology that comported with La.R.S. 47:337.35(C)(4), which required, "Generally recognized sampling techniques and standards set forth by the American Institute of Certified Public Accountants shall be used as guidance in developing sampling techniques for purposes of the Section." Pursuant to *Arledge v. Bell*, 463 So.2d 856 (La.App. 2 Cir. 1985), this court is allowed to consider relevant proffered evidence on appeal. I would find that the manuals relied on by the Collector as guidance and accepted by courts of other states to be relevant to the determination of the methodology utilized by the Collector in its' initial

_____

[3] The manuals referenced in Collector's Proffer One and Two were utilized in the following cases as a basis for audits of bars and restaurants. These cases included *Two Mac, Inc. v. Comm'r of Revenue*, 7469-R, 2004 WL 612911 at 38 n. 2 (Minn. Tax Ct. Mar. 9, 2004); *Edgmon* v. Comm'r of Revenue, 66 T.C.M. (CCH) 1093 at 4 (T.C. 1993); *Yilmaz, Inc. v. Dir., Div. of Taxation*, 22 N.J. Tax 204, 230 (N.J. Tax Ct. 2005).

estimated audit of the Clubs. The sampling method used by the Collector was proper under the law.

Louisiana Revised Statutes 47:337.35(C)(4) further prevented the trial court from accepting the alternative methodology offered into evidence by the Clubs. Therefore, I would find the trial court erred in finding that the Collector was required to use the alternative methodology in question contained in a "presentation by the Louisiana Association of Tax Administrators (LATA) entitled, '*Audits of Bars, Lounges and Restaurants*,'" submitted into evidence by the Clubs. I would find that the Collector's assignment of error two has merit and find that the trial court committed an error of law in its' holding that "the Collector's arbitrary tax collection methodology was improper." For the same reasons, I disagree with the majority's treatment of this issue.

### *Assignment of Error Three*

The Collector argues that the trial court erred in granting attorney fees to the Clubs as the "prevailing party" pursuant to La.R.S. 47:337.13.1(B)(1):

> B. (1) Except as otherwise provided for in Paragraph (3) of Subsection A of this Section, the **prevailing party** in a dispute, contest, or other controversy involving the determination of sales and use tax due shall be entitled to reimbursement of attorney fees and costs, not to exceed ten percent of the taxes, penalties, and interest at issue, unless the position of the non-prevailing party is **substantially justified**. The prevailing party is defined as the party which has substantially prevailed with respect to the amount in controversy or substantially prevailed with respect to the most significant issue or set of issues presented. A position is substantially justified if it has a reasonable basis in law and fact. The reimbursement amount for attorney fees and costs shall be subject to the discretion of the court as to reasonableness.

(Emphasis added.)

I would hold that the trial court erred as a matter of law in finding in favor of

the Clubs and against the Collector. In my view, the Clubs are not the prevailing party and the issue of whether the Collector was "substantially justified" in its assessment such that the Clubs are entitled to attorney fees is rendered moot. I dissent from the majority's affirmation of the trial court's award of attorney fees to the Clubs.

### *Assignment of Error Four*

The Collector argues that the trial court erred in failing to grant a new trial and failing to admit evidence submitted at the hearing for new trial. Considering the ruling I propose, this assignment of error is rendered moot.

### *Assignment of Error Five*

On April 15, 2013, Yesterdays filed an "Amended Petition For Refund," claiming prescription for the tax years 2005 and 2006. Yesterdays' Amended Petition For Refund was prompted by discussions between counsel during a break in the trial proceedings after trial on the merits had already begun, which revealed that the Collector was no longer in possession of a document entitled "AGREEMENT TO SUSPEND PRESCRIPTION OF SALES AND USE TAXES ADMINISTERED BY THE CALCASIEU PARISH SCHOOL SYSTEM" (Waiver) for Yesterdays. The document at issue was additional evidence of the parties' agreement to extend the prescriptive period for Yesterdays for the tax years 2005 and 2006 to December 31, 2010. Counsel for the Collector argued that the prescriptive period for the audit of Yesterdays for the tax years 2005 and 2006 was properly extended by agreement until December 31, 2010, even though it no longer possessed the document evidencing that agreement.

I would hold that the trial court committed legal error in sustaining the Taxpayer's exception of prescription on this issue, filed during a break in the trial

proceedings. While an exception of prescription may be filed at any time, in this case the Taxpayer had already made a judicial confession removing the issue from consideration at the trial on the merits.

Louisiana Civil Code Article 1853 defines judicial confession as follows:

> A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. A judicial confession is indivisible and it may be revoked only on the ground of error of fact.

In the case of *Traina v. Sunshine Plaza, Inc.*, 03-1003, p. 6 (La. 12/3/03), 861 So.2d 156, 160, the supreme court held that "a judicial confession has the effect of waiving evidence relating to the subject matter of the admission and withdrawing the subject matter of the confession from issue." There is no need to determine the issue of prescription if one of the parties made a judicial confession as to the "period in question."

Yesterdays' original "Petition For Refund," filed on October 28, 2010, which was the initial pleading in this litigation, stated in pertinent part:

2.

> **During the period of January 1, 2005 and December 31, 2008** ("**the period in question**"), Yesterdays operated as a night club/bar in Lake Charles, Louisiana.

3.

> **During the period in question**, Yesterdays properly calculated and timely paid parish sales/use tax based upon the total receipts from its bar operations.

4.

> On August 26, 2010, the Department issued a $155,662.95 assessment to Yesterdays for additional taxes ($85, 353.60), interest ($48,970.86), and penalties ($21,338.47). A copy of the Department's revised Notice of Assessment is attached as **Exhibit 1**.

17

5.

Yesterdays disputed the assessment and, pursuant to La.R.S. 47:1476 and 47:337.63 and corresponding provision in the local ordinances for the Parish of Calcasieu and the political subdivisions located therein, on September 29, 2010, paid, **UNDER PROTEST** $155,662.95 to the Department, representing sales/use taxes calculated as owed by the Department from Yesterdays' operations for **the period in question**. A copy of Yesterdays' September 29, 2010 letter to the Department and its check no 516 are attached as **Exhibits 2** and **3**, respectively.

. . . .

7.

Yesterdays shows that the Department assessment of additional sales/use tax for the **period in question** lacks any basis in law or fact, and that Yesterdays has properly and timely paid all applicable sales and use tax from its operations.

(Second emphasis ours.)

Yesterdays' Amended Petition For Refund, filed during trial on April 15, 2013, adding the following paragraph to its original Petition For Refund:

7A.

Yesterdays alleges that any claim for taxes, interest and penalties for the period January 1, 2005 - December 31, 2006, is prescribed.

The Louisiana Supreme Court in *Traina*, 861 So.2d at 159, further discussed the application of La.Civ.Code art. 1853, as follows:

The well settled jurisprudence establishes that an admission by a party in a pleading constitutes a judicial confession and is full proof against the party making it. *Taboni ex rel. Taboni v. Estate of Longo,* 01-2107 (La.2/22/02), 810 So.2d 1142; *Starns v. Emmons,* 538 So.2d 275 (La.1989); *Smith v. Board of Trustees,* 398 So.2d 1045 (La.1981); *Cheatham v. City of New Orleans,* 378 So.2d 369 (La.1979). A judicial confession has the effect of waiving evidence as to the subject of the admission. *Crawford v. Deshotels,* 359 So.2d 118 (La.1978); *Jackson v. Gulf Ins. Co.,* 250 La. 819, 199 So.2d 886 (1967); *Farley v. Frost-Johnson Lumber Co.,* 133 La. 497, 63 So. 122 (1913). A declaration made by a party's attorney or mandatary has the same

18

effect as one made by the party himself. La.Civ.Code art. 1853, cmt. (b).

In reversing the court of appeal and reinstating the trial court's judgment in favor of Traina, the supreme court stated:

> The court of appeal recognized that Sunshine judicially confessed that it had an oral contract with Traina, but reasoned that Sunshine revoked its admission when it filed a subsequent pleading denying any contractual relationship existed. We disagree. La.Civ.Code art. 1853 explicitly provides that a judicial confession may be revoked only on the ground of error of fact. At no time did Sunshine assert its judicial confession of an oral contract was made in error. To the contrary, Sunshine's amended answer confirmed Sunshine's earlier allegation of an oral contract by continuing to allege, in the alternative, that an oral contract existed. Therefore, we must conclude based on the record before us that Sunshine's judicial confession of an oral contract was never revoked on the ground of error of fact.

*Id.* at 160.

Similarly, in this case, in its original Petition For Refund, Yesterdays specifically pled that January 1, 2005 to December 31, 2008 was the tax "period in question." The "period in question" is referred to throughout the original Petition For Refund as the basis for Yesterdays' payment of the Collector's assessment "UNDER PROTEST," and prayer for judgment "in its favor, ordering a refund on all taxes paid under protest."

Exhibits One and Three attached in support of the original Petition For Refund also evidence the "period in question," as "Period(s): 1/05-12/08." Exhibit Two, correspondence, dated September 29, 2010, from Yesterdays' CPA, Mr. Morris, also references payment of "$155,662.95 which is being submitted in payment of the proposed assessment of taxes and interest, and penalties for the period January 2005 thru December 2008."

19

Yesterdays' Amended Petition For Refund "alleges that any claim for taxes, interest, and penalties for January 1, 2005 - December 31, 2006, is prescribed." However, considering the statements made in the original Petition For Refund and the exhibits attached in support thereof, I would find that Yesterdays has made a judicial confession that the "period in question" encompassed "January 1, 2005 and December 31, 2008." In its Amended Petition For Refund, Yesterdays did not assert that its judicial confession of the period in question, January 1, 2005 and December 31, 2008, "was made in error." *See Traina*, 861 So.2d at 160. Therefore, based on the record and pursuant to La.Civ.Code art. 1853, I conclude that Yesterdays' judicial confession that the tax period in question was January 1, 2005 through December 31, 2008, and "was never revoked on the ground of error of fact." *See Traina*, 861 So.2d at 160.

The trial court's ruling that prescription had not been interrupted for the taxes owed by Yesterdays for 2005 and 2006 was based solely on the Collector's failure to produce at trial the written waiver of prescription agreement. However, the judicial confession of Yesterdays in its original Petition For Refund and exhibits was never revoked, and required no further evidence to establish that Yesterdays had validly consented to waive prescription for the tax years 2005 and 2006.

I would find that prescription was interrupted pursuant to La.Civ.Code art.1853 based on the judicial confession made in Yesterdays' original Petition For Refund filed on October 28, 2010. Therefore, the taxes, penalties, and interest owed by Yesterdays for the tax years 2005 and 2006 are not prescribed and are now owed in full by Yesterdays, as well as those for 2007 and 2008, which had not prescribed. I dissent from the majority's contrary holding.

20

**CONCLUSION**

For the foregoing reasons, I would reverse the February 3, 2014 judgment of the trial court in its entirety and find in favor of the Calcasieu Parish Sales and Use Tax Department and against Yesterdays of Lake Charles, Inc. in the amount of $155,662.95 in taxes, interest, and penalties, and against Cowboy's Nightlife, Inc. in the amount of $49,973.99 in taxes, interest, and penalties. Costs of this appeal should be assessed to Yesterdays of Lake Charles, Inc. and Cowboy's Nightlife, Inc.